Filed 1/6/17 (opinion on rehearing)

OPINION ON REHEARING

CERTIFIED FOR PARTIAL PUBLICATION*

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| VIRGINIA BIGLER-ENGLER, as Administrator, etc., <br><br>     Plaintiff and Appellant, <br><br>     v. <br><br> BREG, INC. et al., <br><br>     Defendants and Appellants. | D063556 <br><br><br><br> (Super. Ct. No. GIC870982) |

APPEALS from a judgment of the Superior Court of San Diego County, Ronald S. Prager, Judge. Affirmed in part; reversed in part with directions.

Law Office of Marc O. Stern and Marc O. Stern; Boudreau Williams and Jon R. Williams; Williams Iagmin and Jon R. Williams, for Plaintiff and Appellant Virginia Bigler-Engler, as Administrator, etc.

---

\* Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of discussion parts I.; IV. C., D., E.; V. A.; and VI.

Bowman & Brooke and Michael J. Hurvitz; Gibson, Dunn & Crutcher, Theodore J. Boutrous, Jr., Daniel J. Thomasch, and Blaine H. Evanson, for Defendant and Appellant Breg, Inc.

Cole Pedroza, Kenneth R. Pedroza, Matthew S. Levinson and Joshua C. Traver; Neil, Dymott, Frank, McFall & Trexler, Clark Hudson and Jonathan R. Ehtessabian, for Defendant and Appellant David J. Chao, M.D.

Law Offices of Adrienne D. Cohen, Adrienne D. Cohen, Danielle M. Dalton and Julie R. Ursic, for Defendant and Appellant Oasis MSO, Inc.


This matter arises from Whitney Engler's use of a medical device, the Polar Care 500, that was manufactured by Breg, Inc. (Breg) and prescribed by David Chao, a medical doctor.  Engler suffered injuries as a result of her use of the Polar Care 500, and she brought various tort claims against Chao, his medical group Oasis MSO, Inc. (Oasis), and Breg, among others.

At trial, the jury considered Engler's claims for medical malpractice, design defect (under theories of negligence and strict liability), failure to warn (also under theories of negligence and strict liability), breach of fiduciary duty, intentional misrepresentation, and intentional concealment.  With a few exceptions, the jury generally found in favor of Engler, and against the defendants, on these claims.  The jury awarded $68,270.38 in economic compensatory damages and $5,127,950 in noneconomic compensatory damages to Engler.  It allocated responsibility for Engler's harm as follows:  50 percent to Chao, 10 percent to Oasis, and 40 percent to Breg.

2

The jury made findings of malice, oppression, or fraud as to each defendant on at least one claim. In the punitive damages phase of trial, the jury awarded $500,000 against Chao and $7 million against Breg. The jury declined to award any punitive damages against Oasis.

Breg, Chao, Oasis, and Virginia Bigler-Engler, as administrator of Engler's estate, appeal.[1] They raise numerous challenges to the judgment. In the published portions of this opinion, we consider the following issues: (1) whether Engler's counsel committed prejudicial misconduct during trial; (2) whether the jury's awards of noneconomic compensatory damages and punitive damages are excessive; (3) whether the evidence supported the jury's verdict against Breg for intentional concealment in the absence of a transactional relationship between Breg and Engler (or her parents); (4) whether Oasis falls within the medical provider exception to the doctrine of strict products liability; (5) whether Breg was entitled to an instruction on the learned intermediary doctrine; (6) whether the Medical Injury Compensation Reform Act of 1975 (MICRA) (Civ. Code, § 3333.2) and Proposition 51 (Civ. Code, § 1431 et seq.) apply to the jury's verdict; and (7) whether Engler's pretrial settlement offer under Code of Civil Procedure section 998 complied with the statute. In the unpublished portions of the opinion, we consider additional challenges to the sufficiency of the evidence, the trial court's jury instructions, and the trial court's evidentiary rulings.

_____

[1] Tragically, Engler was killed during the pendency of this appeal. Following her death, Bigler-Engler was appointed administrator of Engler's estate. In that capacity, Bigler-Engler has been substituted in place of Engler in this appeal.

3

For reasons we will explain, we reverse the judgment in part. We conclude the jury's verdict as to several claims was not supported by the evidence, including Engler's intentional concealment claim against Breg and her strict products liability claim against Oasis. In light of our reversal of Engler's intentional concealment claim against Breg, the jury's punitive damages award against Breg must be reversed as well.

We further conclude the jury's award of noneconomic compensatory damages and the jury's award of punitive damages as to Chao are excessive. Those awards will be reversed as well and remanded for a new trial unless Bigler-Engler accepts reductions in those awards to $1,300,000 and $150,000 respectively. In all other respects, the judgment is affirmed.[2]

FACTUAL AND PROCEDURAL BACKGROUND

"As required by the rules of appellate procedure, we state the facts in the light most favorable to the judgment." (*Orthopedic Systems, Inc. v. Schlein* (2011) 202

---

[2]    Following the filing of our initial opinion in this appeal (previously published as *Bigler-Engler v. Breg, Inc.* (2016) 4 Cal.App.5th 1031), Bigler-Engler petitioned the court for rehearing. Bigler-Engler argued that the opinion decided how MICRA and Proposition 51 applied to Oasis's liability for noneconomic damages without affording her the opportunity to brief the issue. We granted rehearing under Government Code section 68081, vacated our initial opinion, and gave the parties the opportunity to address the issue in supplemental briefing. (See *People v. Alice* (2007) 41 Cal.4th 668, 679.) Having considered the supplemental briefs filed by Bigler-Engler and Oasis, we conclude our original discussion of the interplay between MICRA and Proposition 51 was incorrect. We have modified the discussion accordingly. (See part VII.C., *post*.) We have also modified the disposition to ensure the trial court may address any additional damages and allocation issues that may arise on remand, certified part VIII for publication, and addressed certain requests for modification from Bigler-Engler's rehearing petition. Otherwise, this opinion is substantively identical to our initial opinion.

Cal.App.4th 529, 532, fn. 1.)  In this section we provide an overview of those facts necessary to understand the disputed issues in these appeals.  Additional relevant facts will be discussed in the following sections.[3]

In 2003, Engler, a high school athlete, consulted Chao regarding possible surgery on her left knee.  Engler had injured her knee while running hurdles and suffered from pain and weakness, especially during sports.  Chao identified the presence of a loose body underneath her patella and diagnosed Engler with "patella alta" (misalignment of the patella).  Chao also noted a possible tear in Engler's meniscus.  Chao recommended arthroscopic surgery.  He provided Engler and her parents with a written disclosure of the risks of surgery, which Engler's mother signed.

Chao recommended that Engler use a Polar Care 500 device after surgery.  The Polar Care device, manufactured by Breg, is a Class II medical device under California law, available only by prescription.  The Polar Care device is intended to deliver cold therapy to the site of surgery or injury, along the same general lines as an icepack or bag of frozen vegetables.  The Polar Care device consists of a reservoir of ice water, a small pump, and a pad to be placed on the site of surgery or injury.  The pump circulates cold water through the pad.  A dial controls the amount of water that can flow through the pad.  This dial is intended to affect the temperature of the pad, i.e., as the amount of water

_____

3    We note that Bigler-Engler's statement of facts in her respondent's brief is inadequate.  Significant portions discuss documents and statements that were not admitted at trial (such as premarked or identified exhibits) as if they provided a basis for the jury's verdict.  Throughout her briefing, Bigler-Engler does not distinguish between facts derived from evidence actually admitted at trial and other facts.

flowing through the pad decreases, the water flows more slowly through the pad and the patient's body has a greater opportunity to warm it. A thermometer displays the temperature of the water exiting the pad. The Polar Care device can operate continuously for up to 11 hours before the reservoir of ice must be refilled.

Chao told Engler and her parents that the Polar Care device was superior to traditional methods of cold therapy, such as an icepack, because it could be used "continuously" rather than intermittently. Chao said the Polar Care device would decrease her risk of infection and otherwise help Engler recover from her surgery. Chao did not disclose any risks of using the Polar Care device, even though he knew risks existed.

Chao gave Engler and her parents the choice of buying the Polar Care device from his medical group, Oasis, or renting it from Oasis for a period after Engler's surgery. Chao provided Engler and her parents with an Oasis form informing them of Chao's recommendation that Engler use the Polar Care device and describing the two options. The form stated, "Polar Care is a disposable cold therapy system that provides the advantages of early cold therapy at a cost effective price. [¶] . . . [¶] Polar Care cold therapy has been prescribed by your doctor to maximize your return to full function." The form did not discuss any risks of using the Polar Care device.

Engler and her parents chose to rent the Polar Care device from Oasis. Although Oasis (and therefore Chao) profited from the sale and rental of the Polar Care device, Chao did not inform Engler or her parents of the financial interest he had in the

6

transaction.[4]  Chao also did not inform Engler or her parents that the Polar Care device was available from sources other than Oasis.

Engler's surgery occurred in May 2003, and it proceeded without incident.  When Engler awoke in a recovery room after surgery, her surgical wound had been dressed and a Polar Care 500 device was attached to her knee.  Chao's written discharge instructions told Engler to use the device "at 45°F as much as possible for pain/swelling."  Chao also provided Engler and her parents with Breg's instructions for use, which indicated that the "[d]esired temperature is typically between 45 to 55°F for continuous use and below 45°F for sessions of 20 minutes or less."  When Engler's mother asked whether continuous use meant "24/7," Chao replied, "Yes, use it as much as possible."  Similarly, when Engler's mother asked Chao whether Engler should use the Polar Care device even when she slept, Chao said yes.  Neither Chao's written discharge instructions nor Breg's use instructions provided any warnings about injuries from the use of the Polar Care device or disclosed any risk of injury.[5]

---

[4]     At the time of Engler's surgery, Chao was a shareholder in Oasis.  He attended shareholders' meetings where revenues and profits from sales and rentals of medical devices such as the Polar Care 500 were discussed.  Chao had also performed research for Breg and written publications with Breg personnel unrelated to cold therapy.  Chao was friendly with Breg executives, who paid for dinners and golf outings with Chao.  Historical ties also existed between other individuals at Oasis and Breg.  For example, Oasis's founder was a Breg shareholder, and another Oasis employee was a paid Breg consultant who later went to work for Breg.

[5]     The Polar Care device itself had a label with the following warning:  "WARNING: A LICENSED HEALTH CARE PRACTITIONER MUST DETERMINE THE CORRECT TEMPERATURE RANGE FOR EACH PATIENT.  PATIENTS VARY IN SENSITIVITY TO COLD.  A PERIODIC CHECK OF THE TEMPERATURE MUST

Engler and her parents faithfully followed Chao's instructions. Engler wore the Polar Care device as much as possible, including at night. Engler removed it only when she showered, rode in the car, or attended physical therapy. Except for one instance when the thermometer on the device dipped below 45 degrees, Engler kept the temperature between 45 and 50 degrees.

A week after her surgery, Engler saw Chao for a postoperative appointment. Engler's knee was very swollen and painful. She "felt like it was going to explode." Chao aspirated Engler's knee, which involved draining fluid using a large needle. Engler's mother asked Chao whether Engler should continue to use the Polar Care device. He said Engler should use it for at least one week as long as she had pain and swelling. Engler scheduled a follow-up appointment for a month later.

Engler continued to use the Polar Care device as much as possible. After almost two weeks, Engler noticed increased redness and several small blisters on her knee. Engler's mother left a message at Chao's reception desk, but she did not receive a call back. By the next day, the blisters had increased in size, and one burst. Engler's mother called Chao's office and left a message, but again she did not receive a call back. The next morning, Engler noticed a large black area of dead tissue covering much of the

BE MADE AFTER A FLOW RATE HAS BEEN ESTABLISHED FOR THE PATIENT. CAUTION SHOULD BE TAKEN DURING PROLONGED USE, FOR CHILDREN, DIABETICS, INCAPACITATED PATIENTS, AND THOSE WITH DECREASED SKIN SENSITIVITY OR POOR CIRCULATION." Although Engler's surgery occurred in 2003, this label dated from 1994. In the intervening years, Breg had updated its labeling. Breg added warnings regarding skin blistering, itching, discoloration, and increased swelling. Breg did not have a system for replacing labeling on devices that had already been sold, however, and Breg's sales personnel in the San Diego area were unaware of labeling updates.

8

upper half of her knee. Engler's parents called Chao's office again. Chao called them back and told them to bring Engler to his office immediately.

Chao examined Engler's knee. He told Engler and her parents that he had never seen anything like Engler's wound before. He wrote the following in Engler's medical records: "I believe she has at least partial-thickness, possibility full-thickness skin damage, and needs emergent plastic surgery consultation. She is likely to need a future procedure in terms of skin, graft, debridement, wound closure and possibly even flap. Referred to Plastic Surgeon. We will hold off on any icing or physical therapy." Chao also wrote, "At this point in time, I am not sure as to the exact reason [for the damage], possibly over-icing versus infection."

Chao referred Engler to a specialist for immediate treatment. That specialist determined Engler's wound was too difficult for him to handle and referred Engler to Deniz Gocken, a medical doctor specializing in plastic surgery and wound treatment. Gocken examined Engler and admitted her into the hospital. After observing the wound, Gocken performed surgery on June 12 to remove the dead tissue from Engler's knee. Engler remained in the hospital for one week.

Engler's surgery left a large open wound, which took nine additional procedures in 2003 to clean and close. Each of these procedures was performed under local anesthetic and was very painful. Gocken believed that continuous use of the Polar Care device had caused Engler's injury.

When the wound healed, it left a scar covering a large portion of Engler's knee, approximately four inches by three inches in size. The scar caused Engler emotional

9

distress because she was self-conscious about its appearance and because classmates and her boyfriends teased her. Engler subsequently had two scar reduction surgeries in 2007 and 2008. After each surgery, Engler was forced to immobilize her knee for six weeks. Engler felt guilty about having the scar reduction surgeries because her father became unemployed during this time and her family paid for the second surgery out-of-pocket.

By the time of trial in 2012, Engler had a scar across the top portion of her knee. Engler's expert witness recommended two more scar revision surgeries, each to be followed by six weeks of immobilization, that would further decrease the size of the scar. The area surrounding the scar was hypersensitive and painful to the touch. Engler also felt numbness and a deep itching sensation that she could not scratch. Engler had some functional limitations, including weakness and pain while kneeling, inability to continue to ride horses competitively, difficulty with some dance styles (specifically hip-hop), and difficulty riding a bike accompanied by her leashed dog.

In 2006, after seeing a news article about a lawsuit involving Chao and a Polar Care device, Engler filed her own suit against Chao, Oasis, Breg, and others. Several years of contentious litigation ensued, and the court held an eight-week jury trial beginning in May 2012.

At trial, in addition to numerous other lay and expert witnesses, Engler presented evidence from three medical experts that Breg's Polar Care device inflicted a nonfreezing cold injury (NFCI) on her knee. Engler's medical experts testified that the application of cold therapy causes blood vessels to constrict (vasoconstriction), which lowers blood flow and deprives surrounding tissues of oxygen and nutrients. Dangerous

10

vasoconstriction can occur even at the temperature recommended by Chao and Breg (45 degrees) for continuous use of the Polar Care device. Based on the manner of Engler's use, her risk of suffering an NFCI began after three or four days of use and increased with further use. The symptoms of an NFCI include redness or whiteness on the skin and swelling and blistering in the affected area. A serious NFCI, such as that suffered by Engler, causes the death of the surrounding nerves and tissue.

Breg had received numerous reports of individuals who had suffered injuries associated with the Polar Care device. According to Engler's experts, these reports put Breg on notice that the Polar Care device was hazardous. One injured individual was Jeff Warner, whom Chao treated several years before Engler. Warner had a history of prior knee surgeries. Chao performed an additional surgery on Warner's knee and prescribed the Polar Care device for his use. As with Engler, Chao recommended that Warner use the Polar Care device at 45 to 55 degrees "as much as possible to alleviate pain and swelling." In the weeks that followed, Warner experienced redness, swelling, inflammation, and finally mild necrosis on his knee. Chao recommended that Warner continue to use the Polar Care device to reduce swelling. Two weeks later, Warner's necrosis had worsened and Chao referred him to a plastic surgeon. The surgeon performed a skin graft on Warner's knee, a procedure that Chao witnessed. It was highly unusual for Chao to watch such a procedure. Warner subsequently sued Breg and Chao,

among others, in 1999.  Chao received Warner's summons and complaint.  Warner retained the same experts that Engler would later retain.[6]

Based on its injury reports, and according to Engler's experts, Breg knew that use of the Polar Care device could cause injury, including NFCI's.  Breg did not adequately investigate these reports or make them known to the public.  Breg also failed to investigate whether the Polar Care device was safe for continuous use at 45 to 55 degrees before marketing the device to the public.  The Polar Care 500 was primarily designed by two founders of Breg, Bradley Mason and his brother Jeff, the latter of whom had no formal education after high school.  And, although Breg conducted a study on pigs several months before Engler's surgery, its results were not promising.  In the study, a Breg executive researched the effects of continuous use of the Polar Care device over 72 hours.[7]  Over the course of the study, three of the 12 pigs in the study died.  Several pigs exhibited signs of focal skin necrosis, consistent with NFCI, after as few as 30 hours of continuous use.  Despite this research, Breg denied that the Polar Care device could cause NFCI's when used according to its instructions.

---

[6]     The same attorney represented both Engler and Warner.

[7]     The Breg executive responsible for the study, Patrick Cawley, claimed on his resume to have bachelor's and doctoral degrees in science.  Cawley was impeached by evidence showing that he did not obtain a bachelor's degree and his doctoral degree was granted by a school in England on the basis of professional experience and basic research submitted by mail.  Cawley did not take any classes at the school, sit for any exams, or participate in any interviews.  In fact, Cawley had never been to the school's campus at all.

Although Breg touted the benefits of continuous use cold therapy, there was no evidence the Polar Care device was more effective than intermittent icing with an icepack or bag of frozen vegetables. In addition to the risk of injury, continuous use cold therapy can slow down the healing process. Engler's medical expert testified that it was below the standard of care for Chao to prescribe continuous use cold therapy without constant professional monitoring.[8] It was also below the standard of care for Chao to prescribe any cold therapy after the first day or two after Engler's surgery; any further cold therapy was unnecessary and potentially harmful.

Chao first learned about cold therapy during his medical residency. He has prescribed mechanized cold therapy, like the Polar Care device, to thousands of patients. Chao denied knowing that continuous use of mechanized cold therapy at temperatures of 45 to 55 degrees could cause injury if used properly or that cold therapy could cause NFCI's when no moisture was present.[9] Chao denied learning from Breg or any other medical device manufacturer that continuous use of mechanized cold therapy risked injury.

---

[8]    Testing conducted by one of Engler's medical experts revealed that the Polar Care device's temperature controls were ineffective and inadequate. Except for the highest setting, the flow control valve did little to modify the temperature of the Polar Care pad. And, regardless of the flow control setting, the water entering the pad—which came directly from the ice reservoir—was just above freezing. The use of such cold water increased the risk of injury. Because the thermometer on the device measured the temperature of the water exiting the pad after it had already been warmed by the patient's body, this thermometer was of little use.

[9]    Historically, NFCI's were associated with moisture. For example, NFCI's were identified in soldiers during World War I who stood in water and were subsequently exposed to cold. The resulting injury was known was "trench foot."

13

At trial, Breg, Oasis and Chao disputed that continuous use of the Polar Care device would cause injury if used correctly. They contended that continuous use mechanized cold therapy was medically appropriate and offered advantages over traditional cold therapy (e.g., an ice pack or a bag of frozen peas). Defense experts gave alternate explanations for Engler's injury. Chao's expert, for example, testified that Engler used the Polar Care device improperly, which caused her injury. Breg's expert believed that Engler's injury was caused by an infection.

The jury found against Chao on Engler's claims for medical malpractice, breach of fiduciary duty, intentional misrepresentation, and intentional concealment. The jury found against Oasis on Engler's claims for medical malpractice, design defect, failure to warn, and breach of fiduciary duty. The jury found in Oasis's favor on Engler's claims for intentional misrepresentation and intentional concealment. As to Breg, the jury found against it on Engler's claims for design defect, failure to warn, and intentional concealment. The jury found in Breg's favor on her claim for intentional misrepresentation.

The jury further found that Chao and Oasis had acted with malice, oppression, or fraud in connection with Engler's claim for breach of fiduciary duty, that Chao had so acted in connection with Engler's claims for intentional misrepresentation and intentional concealment, and that Breg had so acted in connection with Engler's claim for intentional concealment. As noted, the jury awarded $5,196,220.38 in compensatory damages to Engler, allocating responsibility for Engler's harm as follows: 50 percent to Chao, 10 percent to Oasis, and 40 percent to Breg. In the punitive damages phase of trial, the jury

14

awarded $500,000 against Chao and $7 million against Breg. The jury declined to award any punitive damages against Oasis. Defendants filed motions for judgment notwithstanding the verdict and for a new trial, which the trial court denied.

DISCUSSION

I. *Evidence Regarding "Other Similar Incidents"*

A

Breg contends the court prejudicially erred by allowing testimony regarding 139 other incidents where Breg had received a report of a Polar Care device causing injury. Breg argues the trial court failed to perform its required gatekeeping function before allowing Engler's experts to consider these reports. Chao similarly contends that it was prejudicial error to admit testimony related to one such incident involving Chao's former patient Jeff Warner.

Prior to trial, Engler pursued discovery of information related to injury reports Breg had received. Engler also compiled her own list of alleged injuries from other sources. After years of delay, and several court orders, Breg produced its injury claim files. Based on Breg's conduct in obstructing discovery, the court stated its intent to issue the following evidentiary sanction: "On January 15, 2009, this Court ordered Breg to produce contact information, that is name, address and phone numbers, of all persons who have notified Breg of any injury that had been sustained as a result of the use of any of their Polar Care products. In response, Breg provided contact information on 17 cases on September 28, 2009. Since then it has been learned that Breg had information on at least a hundred more [claims] which should have been provided." At trial, however, the

15

court decided not to read this sanction to the jury based on Breg's concern that it was unduly prejudicial.

Because of the delay in production of the injury claim files, many (if not all) of the parties' experts had already been deposed by the time Breg produced the files. The court and the parties discussed how to manage the experts' consideration of the recently produced information. Breg disputed whether all of the other incidents were relevant. Early in the discussions, the court remarked, "Here's what I think we have to do. We have to go through all these. I can give you my tentative feelings about it. [¶] . . . [¶] And it could be that we're going to end up with, out of 60, I think 40 of them are admissible because they are clearly . . . cold injuries. . . . [¶] But I have to see what the overall picture is first." The court repeated its impression during the same hearing: "I think what we'll do, we'll go through these and I'll give you a tentative on each one, and when we're done, I may go back and modify that." The court believed that any incidents it found admissible could be relied upon by Engler's experts in their opinions, "and there may be some last minute opportunities to depose on some of these right before the testimony."

At the next hearing, the court again explained its proposed procedure: "This is my idea of . . . the tentative procedure for handling prior similar incidents. [¶] It's going to be presented through the testimony of experts. It's the type of hearsay that experts customarily rely on. What I contemplate is a preliminary review where the Court may rule out certain of these instances as not meeting the minimum requisites for prior similar incidents. [¶] Then they will be presented to the [plaintiff's] experts . . . through the

16

plaintiff's counsel, who showed them all these documents that they haven't seen. Then plaintiff's counsel will tell us in advance of their testimony which ones they are going to rely on. . . . [¶] And they will be available for last-minute supplemental depo[sitions] regarding the scope of these opinions as related, especially related to specific instances that they are relying upon." The trial court further explained, "I also think it's important to go through each of these instances, give the defense a chance to eliminate them. From the cases that I've read, I do think the appellate courts expect the trial courts to exercise a gatekeeper function and make some kind of determination."

The court began consideration of each of the incidents Engler intended to introduce. The court eliminated the first, allowed the second, and eliminated the third, fourth, and fifth. Engler's counsel complained about the process, but the court was unpersuaded: "I'm going to continue to go through these one at a time. You might want to make some argument at the end that I ought to reevaluate for some reason, but right now I'm reviewing them based on the information that we have to see if they are cold injuries." The court continued to provide its tentative rulings on eight more incidents and hear argument from counsel.

The next day, the parties and the court began discussing alternatives to going through each incident individually. The court recognized, "It's going to take us a couple of weeks to go through these." The court and the parties discussed various categories of incidents that could potentially be eliminated from the universe of incidents to consider. The court recognized such an agreement could only be made by stipulation. The alternative, in the court's view, was "to force the Court to go through each of these, and I

17

really don't—I'll do the best I can, but I don't have a high—I haven't even heard the experts in the case. I don't have a real high degree of confidence in what I'm doing.[10] And I do believe, and I hear the arguments from both sides, and I believe those arguments could be made to the jury and let the jury decide what—how significant this is or if it supports the defense or supports the plaintiff." The court and the parties considered whether an agreement could be reached regarding the admission of other incidents evidence. The court took a recess to allow the parties to discuss the issue.

After the recess and a discussion off the record, the court explained, "What we're doing, we're just beginning a process of entering into some kind of global stipulation regarding how these claims of other injuries are going to be treated. But the starting point of the stipulation is a recognition by both sides this process of going through 500 claims one at a time for the Court to make some preliminary determinations of admissibility is unduly time consuming and tedious. In fact, it has the potential of delaying the whole trial. . . . [¶] As an alternative to that process, we're going to first eliminate a large number of the claims as to which we have very little information about right now . . . ." The court then stated that the remaining claims would be presented to the jury at trial and the parties would have the opportunity to argue how significant they are.

---

10    The court appeared to be expressing its concern that the process of going through the incidents individually, as the court had been doing, may not be conclusive because the court had not yet heard the experts give their views of similarities and differences between the other incidents and Engler's injuries.

Breg's counsel responded, "Your Honor, I think we're with you generally on why we're doing this. We have an issue in [that] there are others who are involved. We can't stipulate at this point, and so eventually it may become necessary for you to exercise your authority under [Evidence Code section] 352 and other code sections to say this is what I'm ordering, and we are happy to have [that] discussion. I just, as we sit here now, I can't say that at the end of this process we're going to be able to say Breg stipulates to all of this." After a few comments back and forth with the court, Engler's counsel remarked, "And we won't argue that there was a waiver."

The court again explained the perceived advantages of a stipulation. Breg's counsel responded, "Your Honor, perhaps I was not clear. I'm not disagreeing with anything you just said. I'm just saying at the end of this process I'm not sure I'll be in a position to say Breg stipulates." The court stated, "Let me ask you this. Do you feel that, does either side wish to require the Court to continue to make this incident-by-incident? Is either side demanding the Court engage in this process of looking at each incident and trying to make . . . some kind of preliminary determination?" Breg's counsel answered, "Breg is not. We're suggesting we do what you asked us to do, suggest we do, which is meet with counsel and come up with something that makes more sense than what we did yesterday and for awhile this morning." After further discussion, Breg's counsel again stated, "I think it behooves all parties to see if there's a way that makes more sense than what—than the process you just outlined, going through all 500-plus."

The parties also discussed the manner in which any incidents discussed at trial would be presented to the jury. The court stated that the incidents themselves would not

19

be admitted into evidence; they would be received for the limited purpose of supporting expert testimony. Later, Breg's counsel clarified that Breg believed Engler's counsel could question Breg's witnesses about the injury files, but that the injury files themselves should not be admitted.

Later in the hearing, Breg's counsel again expressed support for the court's proposal: "I think we ought to be able to get through the other similar incidents this afternoon and we ought to come back tomorrow morning and report to the Court here's where we are, here's what we think is a workable plan. I should have a better answer from my clients and their principals about stipulations, which as I said is a challenge. But I think we will be able to lay out for you in greater detail what you just outlined, your Honor, how it's going to work, what is the universe of complaints, what are these things admissible for, and then how they will be used at trial."

The next day, Breg reported progress in the discussions about a stipulation. The court and the parties discussed various issues impacted by evidence of other incidents. The court suggested that Breg may want to allow evidence of a broader number of other incidents, so that it could focus on ones that were entirely dissimilar to Engler's injury. Later in the hearing, the court asked whether Breg wanted to go back to the incident-by-incident process. Breg's counsel responded, "No. I think everybody agrees, as I said yesterday, I think everybody agrees that's probably not the best way to do it. I think we're on the right track." Breg's counsel told the court the stipulation could probably be finalized that day.

That afternoon, Breg's counsel informed the court, "I think we have something to propose." Breg's counsel stated that the universe of similar incidents to be discussed at trial would be listed in chart form on a new Exhibit 135. Breg's counsel explained, "So number one, stipulation between Breg and plaintiff, number one, reports of adverse events in this case will be limited to those on Exhibit 135, with the possible exception of any case from [another proceeding] that plaintiff brings to the attention of the Court and the Court finds can be added to Exhibit 135." The parties then discussed related issues, including the exchange of expert information and the possibility of live testimony from other injured individuals. Although the parties referenced Exhibit 135 in this discussion, it appears the chart was eventually marked as Exhibit 134. It was not admitted into evidence.

At trial, Engler called a Breg executive, Kathleen Barber, as her first witness. Barber testified about Breg's awareness of Warner and his injuries. Engler's counsel asked Barber about Breg's injury files, including specific reports of injury. Breg objected to certain questions regarding some details of other incidents, which the court sustained. Later during Barber's testimony, in response to a Breg objection, the court issued a limiting instruction: "Ladies and gentlemen, the only purpose that this is being offered for is not to prove that what actually is in the reports actually happened, but as it may tend to show that [the reports] placed Breg on notice that there were some problems associated with the use of the device, [it] is only offered for that limited purpose." Engler's counsel continued to ask about specific injury reports. Breg did not object to some of the questions involving specific incidents. Breg objected to other questions

21

involving incidents after Engler's surgery, which the court sustained. Breg's counsel requested a running objection to such incidents, but the court found the objection unnecessary. It agreed with Breg's position: "This is offered for really the purpose of notice, so it has to precede Whitney Engler's surgery." Later, the court appeared to reverse course with respect to one incident, on the theory that a later incident would show a pattern and practice of concealment. After further testimony, the court told counsel, outside the presence of the jury, that it believed the jury had heard enough about other incidents and it would be inclined to sustain objections to any further testimony under Evidence Code section 352. Later in the trial, the parties' experts discussed the injury files to the extent they formed the basis of their opinions or their critique of other experts' opinions.

B

Breg contends the trial court abdicated its gatekeeping duty by refusing to determine whether the 139 incidents discussed at trial had sufficient similarity to Engler's injury to be admissible.

"Evidence of other accidents is admissible to prove a defective condition, knowledge, or the cause of an accident, provided that the circumstances of the other accidents are similar and not too remote." (*Ault v. International Harvester Co.* (1974) 13 Cal.3d 113, 121-122.) This principle includes subsequent incidents, which may be relevant to show a defective condition or causation. (*Simmons v. Southern Pac. Transportation Co.* (1976) 62 Cal.App.3d 341, 365; *Fuller v. State of California* (1975) 51 Cal.App.3d 926, 943-944.) In either case, the trial court has a gatekeeping duty to

22

determine whether other incidents are sufficiently similar to be relevant to a disputed issue, e.g., identity, defect, knowledge, or causation.

"A trial court should determine the admissibility of each incident on the basis of whether it is relevant under Evidence Code section 350 and satisfies the requirements of Evidence Code section 352." (*Isaacs v. Huntington Memorial Hospital* (1985) 38 Cal.3d 112, 133.) " 'Identical conditions will rarely be found. Substantial similarity is normally sufficient.' " (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 404.) Moreover, "[w]hen evidence is offered to show only that defendant had notice of a dangerous condition, the requirement of similarity of circumstances is relaxed: ' "all that is required . . . is that the previous injury should be such as to attract the defendant's attention to the dangerous situation . . . ." ' " (*Ibid.*)

The trial court did not evaluate the 139 other incidents discussed at trial for substantial similarity. The record shows, however, that the trial court was aware of its gatekeeping duty and was willing to undertake the required analysis. The court's gatekeeping function was displaced by the parties' stipulation, joined and summarized by Breg's counsel, which allowed evidence of a limited number of incidents for limited purposes. We must therefore determine whether Breg invited the error.

"The 'doctrine of invited error' is an 'application of the estoppel principle': 'Where a party by his conduct induces the commission of the error, he is estopped from asserting it as a ground for reversal' on appeal." (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 403 (*Norgart*); see *Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 212 (*Mary M.*) ["Under the doctrine of invited error, when a party by its own conduct induces the

23

commission of error, it may not claim on appeal that the judgment should be reversed because of that error."].) "At bottom, the doctrine rests on the purpose of the principle, which prevents a party from misleading the trial court and then profiting therefrom in the appellate court." (*Norgart, supra*, 21 Cal.4th at p. 403.)

As our detailed recitation of the record shows, Breg repeatedly informed the trial court that it believed a stipulation governing the admission of testimony related to other instances was desirable. This stipulation was specifically intended to obviate the need for the trial court to make its own determinations regarding the relevance of each incident. For example, Breg told the court, "I think it behooves all parties to see if there's a way that makes more sense than what—than the process you just outlined, going through all 500-plus." Later, the court asked whether Breg would rather the court consider the incidents individually. Breg's counsel responded, "No. I think everybody agrees, as I said yesterday, I think everybody agrees that's probably not the best way to do it. I think we're on the right track." Breg's counsel took the lead presenting the terms of the stipulation to the court. Under these circumstances, Breg invited any error related to the court's failure to consider the relevance of each incident individually by stipulating to the 139 other incidents that were eventually the subject of testimony at trial. If, as Breg now contends, Breg believed such a stipulation would lead to reversible error, its statements to the trial court were highly misleading. Application of the doctrine of invited error is therefore appropriate here.

Breg contends that the court forced it to stipulate and therefore Breg simply made the best of a bad situation. "[T]he doctrine does not apply when a party, while making

24

the appropriate objections, acquiesces in a judicial determination. [Citation.] As [the Supreme Court] has explained, ' "An attorney who submits to the authority of an erroneous, adverse ruling after making appropriate objections or motions, does not waive the error in the ruling by proceeding in accordance therewith and endeavoring to make the best of a bad situation for which he was not responsible." ' " (*Mary M., supra*, 54 Cal.3d at pp. 212-213.) Breg contends it repeatedly objected to any proposed stipulation and only acquiesced when the court ordered it to stipulate.

We have reviewed the record in detail, and it does not support Breg's interpretation. While the court did express concern over of the length of time the parties would spend litigating the issue of substantial similarity for the hundreds of other incidents Engler sought to introduce, it is clear from the record that the parties' decision to stipulate was voluntary. The court repeatedly asked Breg whether it wanted to return to the incident-by-incident process Breg now contends was required. In each instance, Breg declined and expressed its belief that a stipulation was the more desirable way to resolve the issues. We note that in posttrial motions, when Breg presented its version of these events to the trial court, the court characterized Breg's version as "totally reinvented," "totally fallacious," a "total mischaracterization," and "reinventing history." We agree with the trial court's assessment that Breg's version of events is wholly unsupported by the record.

Breg also claims it was "[f]aced with the prospect of 500 irrelevant incidents coming in" to evidence. But, as part of its incident-by-incident analysis, the trial court had rejected the majority of incidents as not substantially similar and therefore irrelevant.

25

There is no reason to believe the trial court would not have fairly and competently assessed the other incidents offered by Engler had the parties not entered into their stipulation. Breg further claims it " 'repeatedly—but unsuccessfully—advised the court' " of its obligation to consider each incident individually for relevance and therefore did not invite any error. (See *Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 329.) Breg did advise the court of its obligations, but then Breg was *successful*. The court agreed to conduct an incident-by-incident assessment. The court was willing to continue that process, but the parties (including Breg) believed a stipulation was more desirable.

Breg contends that Engler's counsel agreed that Breg's stipulation would not be a waiver of Breg's right to object later, thereby preserving the issue for review on appeal. (See *People v. Calio* (1986) 42 Cal.3d 639, 642-644.) We disagree. When the court and the parties initially discussed the possibility of a stipulation, Breg said it was open to discussions about which incidents to include in a stipulation but it could not commit to stipulation at that time. In that context, Engler's counsel remarked, "And we won't argue that there was a waiver." The meaning of Engler's counsel's statement is clear: Engler would not argue that Breg had waived its objections to any incident merely by *discussing* its inclusion in a stipulation. Engler's counsel's statement had no effect after Breg stipulated. Neither Breg nor any other party made a similar statement preserving its rights when Breg announced the terms of the stipulation.

Breg also contends it did not receive any benefit from the stipulation, so it could not have voluntarily agreed. Breg claims any hypothetical benefit must be premised on the assumption that all of the other incidents were admissible. Not so. Breg and Engler

26

had a dispute over which of the other incidents were admissible.  Through the stipulation, Breg obtained assurance that Engler would not seek to introduce incidents beyond those to which Breg agreed.  Engler, on the other hand, obtained assurance Breg would not object to the limited discussion of the incidents that were part of the stipulation.  Each party benefited.  Breg now appears to believe that the stipulation was not a favorable trade.  But that fact, if true, does not call into question the voluntariness of its stipulation under the circumstances here.

We conclude the doctrine of invited error applies here.  Breg stipulated that a limited number of other incidents could be discussed at trial.  It may not now claim prejudicial error because the trial court accepted that stipulation and acted accordingly.

C

Breg contends that even if it stipulated that 139 other incidents could be discussed at trial, the "manner in which [they] were used was improper and prejudicial." (Capitalization omitted.)  Breg fails to explain, however, how the allegedly improper use of the 139 other incidents was prejudicial in light of (1) its stipulation that the other incidents could be used at least for limited purposes and (2) the other evidence in the record supporting Engler's claims.  For example, Breg points to one instance where Engler's counsel read the contents of a specific incident report in the presence of the jury. But, as Breg acknowledges, the court admonished the jury to disregard that statement. Breg has not shown how that isolated reference was prejudicial given the entire record. Similarly, Breg claims error in the court's instruction that the jury should disregard

27

evidence of incidents it did not believe were substantially similar.[11] Viewed in isolation, the court's instruction was erroneous because it tasked the jury with deciding whether the other incidents were sufficiently similar to be relevant and admissible. As noted, and as the trial court itself stated in pretrial discussions, this determination is the court's responsibility. (*Isaacs v. Huntington Memorial Hospital, supra*, 38 Cal.3d at p. 133.) Given the parties' stipulation, however, this error appears to be invited as well. Moreover, we fail to see how this instruction—in and of itself—prejudiced Breg. Based on our review of the record, the instruction likely assisted Breg in arguing that the jury should disregard various incidents discussed pursuant to its stipulation because they were not sufficiently similar to Engler's injury.

Breg also argues that the other incidents were "misused" to prove notice and causation. Breg's argument amounts to scattered disagreements with Engler and her experts about the significance of the evidence of other incidents and whether they supported Engler's claims. But Engler's experts were also allowed to discuss the other incidents under the stipulation. To the extent Breg now contends these other incidents should not have been the subject of expert testimony, Breg has invited the error for the

[11] During Barber's testimony, the court gave the jury the following instruction: "And also, later on ladies and gentlemen, there may be a discussion about some of these events that occurred afterwards through experts from both sides who may disagree about whether or not these incidents were similar to Whitney Engler's injury. And it will be, you know, it will—if it's admitted to show that somehow Breg concealed information, that it turns out it is not similar to Whitney Engler's injuries and you after hearing the testimony of experts you believe that the injuries are different, it is not really similar, then it would have no—should have no weight on your decision but that will depend upon testimony you haven't heard yet from expert[ ] witnesses."

28

reasons we have already discussed. To the extent Breg contends the expert testimony was inadmissible for any other reason, Breg has not shown it properly preserved any objection, that admission of any testimony was an abuse of discretion, or that any alleged error was prejudicial. Similarly, Breg's claim that Engler's counsel used the 139 other incidents as a "collective club" is conclusory and unsupported by any legal analysis showing error or prejudice stemming from any specific statement.[12] (Italics and bold typeface omitted.)

### D

Breg, joined by Chao, focuses on Engler's "misuse" of one prior incident involving Warner. Breg characterizes the trial court's ruling allowing admission of facts surrounding the Warner case for the purpose of notice as "[a]stonishing[]" but fails to connect its argument to established legal standards governing the admission of prior incidents for purposes of notice.

"Before evidence of previous injuries may be admitted on the issue of whether or not the condition as it existed was in fact a dangerous one, it must first be shown that the conditions under which the alleged previous accidents occurred were the same or substantially similar to the one in question. [Citations.] The strictness of this requirement of similarity of conditions is 'much relaxed,' however, when the purpose of the offered evidence is to show notice, 'since all that is required here is that the previous

---

[12] Breg's additional argument that evidence of other incidents was misused to prove concealment is moot in light of our reversal of the jury's verdict on Engler's concealment cause of action. (See part IV. A., *post*.)

injury should be such as to attract the defendant's attention to the dangerous situation which resulted in the litigated accident.' " (*Laird v. T.W. Mather, Inc.* (1958) 51 Cal.2d 210, 220; see *Hasson v. Ford Motor Co., supra*, 32 Cal.3d at p. 404 ["When evidence is offered to show only that defendant had notice of a dangerous condition, the requirement of similarity of circumstances is relaxed:  ' "all that is required . . . is that the previous injury should be such as to attract the defendant's attention to the dangerous situation . . . ." ' "].)  We review the court's decision to admit evidence of other incidents for abuse of discretion.  (*Salas v. Department of Transportation* (2011) 198 Cal.App.4th 1058, 1072 ["The question of admissibility of other accidents is primarily one for the trial court and is confined to its sound discretion."].)

Breg and Chao have not shown any abuse of discretion in the trial court's admission of evidence related to Warner.  This evidence was introduced for purposes of notice.  The trial court could reasonably have found that the circumstances of Warner's injury were sufficiently similar to the circumstances of Engler's injury—including the same medical device, the same instructions, and similar resulting injuries and treatments—to attract Breg and Chao's attention to the dangerous situation posed by the Polar Care 500 when used as Breg and Chao recommended for Engler.  Breg and Chao point to factual differences that distinguish Engler from Warner, including Warner's presurgical scars that reduced his circulation in parts of his knee.  Reduced circulation was potentially a contraindication for cold therapy like the Polar Care 500.  But, on this record, these factual differences do not make the trial court's decision unreasonable given the other similarities between the two incidents.

30

Chao additionally argues that evidence related to Warner should have been excluded under Evidence Code section 352. That statute provides as follows: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) Chao claims he was unduly prejudiced by admission of evidence relating to Warner because Warner was also Chao's patient, also used the Polar Care 500, also developed a necrotic wound, and also sued. Chao's argument, however, highlights the similarities between Engler's and Warner's circumstances. Based on the record before us, we cannot say the court abused its discretion under Evidence Code section 352 in admitting evidence related to Warner. (See *Vorse v. Sarasy* (1997) 53 Cal.App.4th 998, 1009 ["The prejudice that [Evidence Code] section 352 ' "is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." [Citation.] "Rather, the statute uses the word in its etymological sense of 'prejudging' a person or cause on the basis of extraneous factors.". . . '. . . ."].)

## II. *Misconduct by Engler's Counsel*

Oasis and Chao contend the trial court erred by denying their motions for a new trial on the grounds that Engler's counsel, Marc Stern, committed prejudicial misconduct. They argue Stern denigrated defense counsel and the court, repeatedly violated pretrial in limine rulings, and attempted to prejudice the jury through unethical trial tactics. We agree there were several instances where Stern acted inappropriately. However, based on

31

our independent review of the record, and taking into account the trial court's observations about the nature of the proceedings during a hearing on defendants' motions for a new trial, we conclude Oasis and Chao have not shown prejudice.

## A

The record shows Stern insulted and ridiculed defense counsel in the presence of the jury on multiple occasions. During his examination of a Breg executive, Stern suggested that Polar Care devices be tested on defense counsel (as in Breg's pig study) because "[t]hey're just lawyers, okay." When defense counsel examined Bigler-Engler and asked whether she could open a Band-Aid for use during questioning (because Engler had used Band-Aids after surgery), Stern interrupted, asking whether counsel was going to put the Band-Aid over her mouth: "Are you going to put it over your mouth or—I don't have an objection." Several days later, Stern repeated his remark, more forcefully this time: "I think this is déjà vu. I'm almost sure. Am I going to have to suggest that she put that Band-Aid on her again?"

During Stern's examination of an expert witness, the court sustained a defense objection on the ground the defense had not been provided the information. Stern then remarked, "They don't want to know, apparently." Breg's counsel objected and moved to strike, which the court granted. The court told Stern, "Try to cut down on the gratuitous remarks," but Stern retorted, "TMI?" (i.e., too much information). Similarly, during defense examination of an expert witness, Stern objected to a defense question. The court overruled Stern's objection, but Stern continued, "It's ridiculous, too." Again, the

court admonished Stern: "Mr. Stern, no more of those under-the-breath remarks, okay? That is very unprofessional. And the jury is admonished to disregard those remarks."[13]

Stern's disrespect extended to the court. Stern repeatedly violated the court's in limine rulings. Contrary to the court's orders, Stern asked about a defense expert's history of malpractice claims, suggested Chao had been involved in other malpractice suits, named the founder of Oasis (the publicity surrounding whom may have been unduly prejudicial), detailed relationships between Breg, Oasis, and Chao unrelated to the Polar Care device and cold therapy, described the Polar Care 500 as a "dangerous device" under California law, and referenced an offer to purchase Oasis's durable medical equipment business.[14] Stern persisted in asking questions despite sustained objections and made improper speaking objections in front of the jury.

Many of these violations drew objections, which were for the most part sustained. At one point, the court remarked on the persistence with which Stern pursued objectionable topics. In the presence of the jury, the court stated, "I'm waiting for the

---

[13]    Outside the presence of the jury, Stern implied that Chao's counsel was part of the Ku Klux Klan. Chao's counsel told the court he would be away for the weekend at a ranch "somewhere out east." Stern interjected, "Where they run around with white sheets over their heads."

[14]    Oasis contends that Stern improperly suggested to the jury that Warner's lawsuit had settled. Stern said, "You know, I have my own guilt about my role in this case. I often think if I had tried the Warner case, Whitney wouldn't have been injured." Stern's statement does not disclose that Warner's lawsuit settled. And our review of the record does not show any objection by Oasis or the other defendants to Stern's statement. Oasis also contends that Stern held photographs of Warner's injuries such that the jury could see them. We note that graphic testimony regarding Warner's injuries was admitted without objection directly prior to Stern's display of the photographs.

point in the trial to say to you: What is it about the meaning of the word 'no' that you do not understand." Stern responded, "You're sounding like my mother." The transcript reflects laughter at that point.

In response to a motion for mistrial, the court recognized Stern's conduct during the first week of trial had been improper, but the court denied the motion. The court explained, "[N]one of them rise to the level of [a] mistrial and even taken together I don't think it [comes] close to a mistrial. [¶] But on the other hand I would point out that I mean jurors are not stupid, and I think when Mr. Stern becomes aggressive, makes inappropriate remarks, this may not have a very positive effect on his case . . . . I think having numerous objections sustained, being admonished by the court, making inappropriate comments about, you know, comparing the defense attorneys to swine, you know, I mean the jury sees all of this." A week later, the court told Stern he was "pushing the envelope" by asking questions in violation of in limine rulings.

Stern also improperly suggested that additional evidence of defendants' liability existed but he was prevented from presenting it to the jury. In his opening statement, Stern told the jury, "And now you are *not* going to see all the evidence we have in this case. That's one of the purposes we spent the last month trying to figure out what's admissible, what's not admissible." (Italics added.) Stern also told the jury he could not tell them how much profit Oasis made selling and renting Polar Care devices because of "pretrial orders." In his closing argument, Stern returned to this theme: "I have been with this case so long, I feel it's my duty to get every shred of evidence that I know about, that I've gleaned from the last 14 years to you. [¶] And the court has warned me often,

34

you don't need to get 100 percent in; but, I feel like I've let Whitney and you down, I feel like maybe you know about 75 or 80 percent of the evidence that I think is relevant. A lot of people would say the other 20 percent isn't relevant, but, I apologize to you for not getting that out to you." Defense counsel did not object to these statements at the time.[15]

Chao filed a motion for new trial arguing, among other grounds, that Stern's misconduct was prejudicial and required a new trial on liability and damages. Oasis filed a similar motion. The court denied both motions. At a hearing on the motions, the court explained its reasoning as follows: "In any event, my overall impression, I'm the trier of fact, I have been doing this almost 25 years, Mr. Stern is a very aggressive attorney, as far as assessing cumulative impact I think I'm in a better position to address than any appellate court because I have been here. I don't think we got close to a mistrial based on attorney misconduct. [¶] I didn't think he got close. I hope the appellate court listens to me because I was here watching the entire trial. I've been living with this case for years. That's my impression." In its minute orders denying the motions, the court stated, "As to attorney misconduct, the Court disagrees with [the] contention that Plaintiff's counsel's actions constituted misconduct or prejudiced the outcome of the case. As this Court has

---

15      Defense counsel did object to a large number of boxes that Stern had with him during opening statements. The boxes had labels that referenced topics such as punitive damages. Prior to opening statements, the court told Stern to turn the labels away from the jury's view. After additional objections, the court told Stern to remove the boxes from the courtroom. Stern had the boxes placed in the hallway where the jury waited, but with the labels visible. After still more objections, the court told Stern to move the boxes to the end of the hallway.

previously noted, it was well aware of the actions of counsel.  Based on the Court's personal observations, the argument lacks merit."

B

"The law, like boxing, prohibits hitting below the belt.  The basic rule forbids an attorney to pander to the prejudice, passion or sympathy of the jury."  (*Martinez v. Department of Transportation* (2015) 238 Cal.App.4th 559, 566 (*Martinez*).)  "The rule also manifests itself by prohibiting irrelevant ad hominem attacks."  (*Ibid.*)  "Personal attacks on the character or motives of the adverse party, his counsel or his witnesses are misconduct."  (*Stone v. Foster* (1980) 106 Cal.App.3d 334, 355 (*Stone*).)  Similarly, repeated violations of pretrial in limine rulings, despite sustained objections, is misconduct.  (*Martinez, supra*, 238 Cal.App.4th at p. 567.)

As the foregoing discussion demonstrates, there were several incidents of misconduct during trial.  Stern insulted opposing counsel, ignored in limine rulings and admonishments from the court, persisted in asking objectionable questions despite sustained objections, and improperly suggested that additional evidence of defendants' liability existed (blaming the court for his inability to offer it at trial).  On appeal, except for the photographs of Warner that Stern allegedly displayed, Bigler-Engler does not address the specific instances of misconduct or justify Stern's behavior.  (Stern is cocounsel for Bigler-Engler in this appeal.)

Although Stern committed misconduct, in some cases Chao and Oasis did not preserve the error for review.  "[T]o preserve for appeal an instance of misconduct of counsel in the presence of the jury, an objection must have been lodged at trial and the

36

party must also have moved for a mistrial or sought a curative admonition unless the misconduct was so persistent that an admonition would have been inadequate to cure the resulting prejudice. [Citation.] This is so because '[o]ne of the primary purposes of admonition at the beginning of an improper course of argument is to avoid repetition of the remarks and thus obviate the necessity of a new trial.' " (*Garcia v. ConMed Corp.* (2012) 204 Cal.App.4th 144, 148 (*Garcia*).) Raising the issue for the first time in a posttrial motion is insufficient because the trial court has no ability to correct the misconduct at that point. (See *Grimshaw v. Ford Motor Co*. (1981) 119 Cal.App.3d 757, 797 (*Grimshaw*).) Here, Chao and Oasis have failed to preserve at least their objections based on Stern's opening and closing statements because they did not contemporaneously object.

With this forfeiture in mind, we turn to the question of prejudice. "[I]t is not enough for a party to show attorney misconduct. In order to justify a new trial, the party must demonstrate that the misconduct was prejudicial. [Citation.] As to this issue, the reviewing court makes 'an independent determination as to whether the error was prejudicial.' [Citation.] It 'must determine whether it is reasonably probable [that the appellant] would have achieved a more favorable result in the absence of that portion of [attorney conduct] now challenged.' [Citation.] It must examine 'the entire case, including the evidence adduced, the instructions delivered to the jury, and the entirety of

37

[counsel's] argument,' in determining whether misconduct occurred and whether it was sufficiently egregious to cause prejudice." (*Garcia, supra*, 204 Cal.App.4th at p. 149.)[16]

In determining prejudice, we evaluate the following factors: "(1) the nature and seriousness of the misconduct; (2) the general atmosphere, including the judge's control of the trial; (3) the likelihood of actual prejudice on the jury; and (4) the efficacy of objections or admonitions under all the circumstances." (*Martinez, supra*, 238 Cal.App.4th at p. 568; see *Sabella v. Southern Pacific Co.* (1969) 70 Cal.2d 311, 320-321.)

Considering Stern's misconduct in light of these factors and the entire record, we conclude it was not prejudicial. This case was hotly contested, with all parties represented by capable, experienced counsel. Although defendants' liability was not a foregone conclusion (as evidenced by the jury rejecting some of Engler's claims), the

_____

[16]     Bigler-Engler contends we should review the trial court's determination that Chao and Oasis were not prejudiced for abuse of discretion. Bigler-Engler relies on criminal cases reviewing a trial court's denial of a mistrial, but the cases cited do not involve attorney misconduct. (See *People v. Valdez* (2004) 32 Cal.4th 73, 128; *People v. Bolden* (2002) 29 Cal.4th 515, 555.) The Supreme Court has held that the appropriate standard of review for a trial court's denial of a motion for new trial based on attorney misconduct is de novo, at least on the issue of prejudice. (*Los Angeles v. Decker* (1977) 18 Cal.3d 860, 872 (*Decker*) ["In our review of such order denying a new trial, as distinguished from an order granting a new trial, we must fulfill our obligation of reviewing the entire record, including the evidence, so as to make an independent determination as to whether the error was prejudicial."].) Although a number of earlier cases emphasized that appellate courts must defer to the trial court's finding of no prejudice (see, e.g., *Stevens v. Parke, Davis & Co.* (1973) 9 Cal.3d 51, 72; *Cope v. Davidson* (1947) 30 Cal.2d 193, 203; *Walling v. Kimball* (1941) 17 Cal.2d 364, 369), the Supreme Court's more recent decision in *Decker* is determinative here and has been followed by other Courts of Appeal in recent cases. (See, e.g., *Martinez, supra*, 238 Cal.App.4th at p. 568; *Garcia, supra*, 204 Cal.App.4th at p. 149; but see *Grimshaw, supra*, 119 Cal.App.3d at p. 794 [post-*Decker* case applying deferential standard].)

evidence supporting several of Engler's claims was strong. Thus, while Stern's misconduct was serious, it was neither so pervasive nor so egregious that it prevented the jury from rationally considering the evidence admitted at trial. The fact that the jury returned a mixed verdict supports this conclusion.

Stern's offer to test the Polar Care devices on defense counsel was an ill-considered attempt at lawyer humor. Stern's suggestion that a defense attorney place a Band-Aid over her mouth was inappropriate and demeaning, but the jury likely saw that Stern was in the wrong. The disrespect Stern showed to the court in repeatedly "pushing the envelope" is particularly concerning. Although the record reflects the court was in command of the proceedings, it permitted a certain level of informality, which Stern often exploited. While such informality can create a risk of misconduct such as that which occurred here, the court did not hesitate to admonish Stern on several occasions in the jury's presence.[17]

Stern's violations of pretrial in limine orders were relatively minor in the context of the lengthy, contentious trial. Most examples of the improper material suggested by Stern were simply variations on, or more detailed descriptions of, evidence that was already properly admitted. Other examples, such as the naming of Oasis's founder, were fleeting and likely went unnoticed by the jury. Still other examples appear to have

---

[17]    We believe Stern's comments in his opening and closing statements that other evidence of defendants' liability existed but he was prevented from offering it at trial to be the most serious example of counsel's disrespect for the courts. Although Chao and Oasis did not preserve this issue for appeal, we consider it sufficiently egregious to merit comment again here.

prompted the court to reconsider its in limine orders and admit the evidence in question. While Stern's decision to ask a question in violation of such orders is misconduct, the court's decision to change its in limine order (which it may properly do) makes any prejudice stemming from the misconduct negligible.[18]  Similarly, Stern's practice of drawing repeated objections and making speaking objections does not appear, on this record, to have prejudiced the jury, and we note that both sides engaged in speaking objections and rebuttals in front of the jury.

Our review of the record, moreover, shows that the defendants were successful in objecting to most of Stern's misconduct.  The court sustained numerous objections and admonished Stern in front of the jury.  While Stern sometimes flouted the court's directions, this isolated disobedience was insubstantial when the misconduct is compared to the overall sweep of the six-week trial.  It did not undermine the court's authority in the eyes of the jury or cause the jury to disobey the court's instructions.

Additionally, the court's instructions addressed many of the potential sources of prejudice.  For example, the court instructed the jury that it must base its verdict on the facts admitted at trial and not let bias, sympathy, or prejudice influence its decision.  The court instructed the jury that the statements and questions of attorneys are not evidence

---

[18]    Oasis's claim that prejudice can be shown by the court's order denying its motion for judgment notwithstanding the verdict is therefore unpersuasive.  Oasis points to evidence cited by the court in its order that Oasis contends was excluded by pretrial in limine orders.  But the court could properly determine, during trial, that the evidence should be admitted notwithstanding its in limine orders.  The mere fact that the court relied on such evidence therefore does not establish prejudice under the circumstances here.

40

and any question to which an objection was sustained should be disregarded. While such instructions may not be adequate to cure the prejudice caused by attorney misconduct in all cases, these instructions, along with the fact the jury rejected some of Engler's claims, support our conclusion that Chao and Oasis were not prejudiced on the record here.

Given the strength of the evidence as to certain claims (several of which are not challenged on appeal), the length of the trial, the numerous other contested issues confronting the jury, and taking into account the trial court's observations about the nature of the proceedings, the misconduct identified by Chao and Oasis does not appear in and of itself to have actually prejudiced the jury. Chao and Oasis have not shown it is reasonably probable they would have achieved a more favorable result on liability in the absence of Stern's misconduct.[19]

Although we conclude Chao and Oasis have not shown prejudice here, Stern's conduct was improper. Such conduct not only falls below professional standards, it unnecessarily places the client at risk. " '[P]unishment of counsel to the detriment of his client is not the function of the court. [Citation.] Intemperate and unprofessional conduct by counsel . . . runs a grave and unjustifiable risk of sacrificing an otherwise sound case for recovery, and as such is a disservice to a litigant.' " (*Neumann v. Bishop* (1976) 59 Cal.App.3d 451, 489 (*Neumann*).) We expect more from our attorneys; in another context reversal may well have been warranted.

---

19    We will consider whether the misconduct, combined with other facts, requires reversal of the jury's damage award in the next part, *post*.

41

III. *Damages*

A. *Excessive Compensatory Damages*

Breg, Chao, and Oasis argue the jury's award of $5,127,950 in noneconomic compensatory damages was excessive. We agree. Although the trial court denied defendants' motions for a new trial on this ground, for reasons we will explain we conclude the jury's noneconomic compensatory damages award is excessive, is not supported by the evidence, and appears to be the result of passion and prejudice. For reasons we will explain, and as a matter of judicial economy, we will exercise our authority to reverse the jury's noneconomic compensatory damages award and remit the award to the maximum amount supported by the current record, conditioned on Bigler-Engler's acceptance of the reduced amount. If Bigler-Engler does not accept the reduced amount, the trial court should conduct a new trial on that issue. We will consider the effect of this conclusion on the jury's punitive damage award in the next section, *post*.

"The amount of damages is a fact question, first committed to the discretion of the jury and next to the discretion of the trial judge on a motion for new trial. They see and hear the witnesses and frequently, as in this case, see the injury and the impairment that has resulted therefrom. As a result, all presumptions are in favor of the decision of the trial court [citation]. The power of the appellate court differs materially from that of the trial court in passing on this question. An appellate court can interfere on the ground that the judgment is excessive only on the ground that the verdict is so large that, at first blush, it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury." (*Seffert v. Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 506-507

(*Seffert*).) " 'The question is not what this court would have awarded as the trier of fact, but whether this court can say that the award is so high as to suggest passion or prejudice.' " (*Id.* at p. 507.)

"In making this assessment, the court may consider, in addition to the amount of the award, indications in the record that the fact finder was influenced by improper considerations." (*Don v. Cruz* (1982) 131 Cal.App.3d 695, 707.) The relevant considerations include inflammatory evidence, misleading jury instructions, improper argument by counsel, or other misconduct. (*Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 615 (*Rufo*); *Neumann, supra*, 59 Cal.App.3d at p. 469 ["to evaluate the defendant's claim that the judgment . . . is so excessive as to shock the conscience and give rise to a presumption that it was the result of passion and prejudice . . . , it is necessary to review the record on the question of the plaintiff's counsel's contribution to such a result"].)

"There are no fixed or absolute standards by which an appellate court can measure in monetary terms the extent of the damages suffered by a plaintiff as a result of the wrongful act of the defendant. The duty of an appellate court is to uphold the jury and trial judge whenever possible. [Citation.] The amount to be awarded is 'a matter on which there legitimately may be a wide difference of opinion' [citation]." (*Seffert, supra*, 56 Cal.2d at p. 508.) The difficulty inherent in assessing damages is plainly evident when noneconomic damages such as pain and suffering are at issue: " 'One of the most difficult tasks imposed upon a jury in deciding a case involving personal injuries is to determine the amount of money the plaintiff is to be awarded as compensation for pain and suffering. No method is available to the jury by which it can objectively evaluate

43

such damages, and no witness may express his subjective opinion on the matter. [Citation.]  In a very real sense, the jury is asked to evaluate in terms of money a determent for which monetary compensation cannot be ascertained with any demonstrable accuracy.' " (*Loth v. Truck-A-Way Corp.* (1998) 60 Cal.App.4th 757, 764 (*Loth*); see *Capelouto v. Kaiser Foundation Hospitals* (1972) 7 Cal.3d 889, 896 ["even in the absence of any explicit evidence showing pain, the jury may infer such pain, if the injury is such that the jury in its common experience knows it is normally accompanied by pain"].)  Moreover, "[n]oneconomic damages do not consist of only emotional distress and pain and suffering.  They also consist of such items as invasion of a person's bodily integrity (i.e., the fact of the injury itself), disfigurement, disability, impaired enjoyment of life, susceptibility to future harm or injury, and a shortened life expectancy." (*Buell-Wilson v. Ford Motor Co.* (2006) 141 Cal.App.4th 525, 549 (*Buell-Wilson*), judgment vacated on other grounds *sub. nom. Ford Motor Co. v. Buell-Wilson* (2007) 550 U.S. 931.)

We review the jury's damages award for substantial evidence, giving due deference to the jury's verdict and the trial court's denial of the new trial motion. (*Mendoza v. City of West Covina* (2012) 206 Cal.App.4th 702, 720; *Rufo, supra*, 86 Cal.App.4th at p. 614.)  "In considering the contention that the damages are excessive the appellate court must determine every conflict in the evidence in respondent's favor, and must give him the benefit of every inference reasonably to be drawn from the record [citation]." (*Seffert, supra*, 56 Cal.2d at p. 508.)

We begin with the jury's verdict. The jury awarded Engler approximately $44,270 in past economic damages and $24,000 in future economic damages, for a total of approximately $68,270. (These damages are not challenged on appeal and are fully supported by the evidence.) For past noneconomic damages, the jury awarded Engler $3,000,000. For future noneconomic damages, the jury awarded Engler $2,127,950.

The record contains ample evidence that Engler's use of the Polar Care 500 caused her to suffer an NFCI on her knee, which initially manifested itself as painful swelling, followed by blisters of increasing size, and finally a large black area of necrotic tissue covering a portion of her knee. During this time, Engler experienced periods of substantial pain (including when Engler felt like her knee "was going to explode") and anxiety.

Engler was admitted to the hospital, underwent surgery to treat the necrosis, and spent one week there. The surgery left a large open wound which required daily treatment. Engler underwent nine additional procedures, under local anesthetic, to clean and close the wound. These additional procedures were very painful. After the wound healed, it left a large scar on her knee, approximately four inches by three inches in size. Engler was highly distressed by the appearance of her scar and the fact her classmates and boyfriends teased her about it.

To improve the appearance of the scar, Engler had two scar reduction surgeries. She was required to immobilize her knee for six weeks after each surgery, thus seriously disrupting everyday activities. Engler felt guilty about having the surgeries because her father was unemployed and they did not have health insurance. Two additional scar

45

reduction surgeries, again followed by six weeks of immobilization for each, were recommended. Because these procedures would interrupt her busy school obligations, Engler chose to defer these surgeries.

By the time of trial, Engler's scar was substantially smaller. The area surrounding the scar was still hypersensitive and painful to the touch, and she experienced weakness and pain when kneeling. When asked to describe the impact on her daily routine, Engler said she rode horses, but she was now unable to ride competitively. Similarly, Engler could ride her bike, but she had difficulty riding while holding her dog's leash. She also had difficulty dancing to hip-hop music. Engler acknowledged that otherwise she was in good mental and physical health.

Engler's counsel requested the jury award $1,000 per day in noneconomic damages for the 90-day period from Engler's first surgery through the completion of her debridement procedures ($90,000), when she was in substantial pain, and $500 per day for the two six-week periods after Engler's scar revision surgeries ($42,000). He did not suggest a daily or cumulative dollar figure for pain and suffering during the almost nine years between Engler's recovery from her second scar surgery and trial. For future noneconomic damages, Engler's counsel suggested $50 to $150 per day for the rest of Engler's expected lifespan. Based on actuarial tables indicating Engler had a remaining life expectancy of 58 years, this translated into a request of approximately $1,063,975 to $3,191,925.

In the end, the jury awarded $3,000,000 in past noneconomic damages, or about $900 per day, and $2,127,950 in future economic damages or about $100 per day. In

46

determining whether these awards are legally excessive, the key question is whether the award was so high as to shock the conscience and suggest the jury was influenced by improper considerations. We conclude it was.

We start with the recognition Engler suffered a serious injury. Initially, the pain was persistent, substantial, and at times felt as if her "knee was going to explode." The debridement procedures and surgeries were extremely painful, the resulting scar disfiguring, and her daily activities highly compromised. Understandably, these circumstances caused considerable emotional distress, anxiety and embarrassment. For this approximately six-month period, Engler's counsel requested $1,000 per day for the 90 days and $500 per day for the two six-week periods following surgery. The evidence fully justified an award at this level, totaling $132,000.

But as to the remainder of the jury's $3 million award for past noneconomic damages, the award is excessive and unsupported by the evidence. In the nearly nine years between Engler's last medical procedure and the time of trial, Engler's condition improved steadily and dramatically. By the time of trial, her pain was at a low level, intermittent, and confined to the area around her scar; her daily activities had returned to normal with the exception of minor physical limitations associated with specific recreational activities; her scar was small and far less noticeable;[20] and her anxiety and stress were substantially reduced.

---

[20] Engler displayed her knee to the jury, but there are no photographs or trial testimony describing the details of the condition of the scar at the time of trial.

Yet, despite her consistent improvement and excellent recovery, and assuming the jury adopted counsel's suggestion to compensate Engler on a daily basis, the $3 million figure reflects the jury awarded nearly equivalent amounts per day whether Engler was suffering extreme pain, disfigurement, and serious interruption of daily activities versus minimal physical discomfort, intermittent curtailment of daily activities, and some anxiety over the condition of her scar. Alternatively, if the jury used a different approach and front loaded the damages, such an award is grossly disproportionate to the actual noneconomic damages Engler suffered in the first three to four years after surgery.

Based on similar reasoning, we find the jury's award in excess of $2 million for future noneconomic damages (approximately $100 per day for 58 years) legally excessive. Except for the option of undergoing future scar reduction surgery, Engler was doing well physically and mentally. There was no suggestion of the prospect of suffering a significant future disability, shortened life expectancy, inability to succeed professionally, or a distrust of doctors or other fiduciary advisors. On this record, therefore, the jury's total $5.1 million award is excessive, strongly suggesting the jury was influenced by improper factors.

Although our analysis rests primarily on the facts and circumstances of this case, our review of cases involving awards of the magnitude awarded here further supports our conclusion Engler's damages award shocks the conscience. (See *Daggett v. Atchison, Topeka & Santa Fe Railway Co.* (1957) 48 Cal.2d 655, 666.) For example, in *Ford v. Polaris Industries, Inc.* (2006) 139 Cal.App.4th 755, 765, where the jury awarded $3,262,500 in noneconomic damages, the plaintiff suffered massive injuries after falling

48

off a personal watercraft or "jet ski." The court described plaintiff's injuries as follows: "[Plaintiff] sustained a severe hernial and rectal injury. Her internal bleeding required multiple transfusions. Two surgeries were required to prepare and establish a colostomy. Medical records indicate she also required 'massive resuscitation . . . from her initial operation.' [¶] [Plaintiff] was in the hospital for 10 days, followed by a five-day postoperative stay at North Bay Medical Center. [¶] [Plaintiff] has no control over her bowels. . . . [¶] The injuries also created urological complications such that Susan must self-catheterize in order to urinate. As well, [plaintiff] is numb from her right kneecap to her waist; her buttocks and pelvic area are also numb." (*Id.* at pp. 759-760.) Plaintiff could no longer engage in normal activities such as softball and dancing, her sex life suffered, and she was unable to continue to work. (*Id.* at p. 760.) The contrast with Engler's injuries is evident; yet, Engler was awarded approximately $1.8 million more in noneconomic damages than this plaintiff.

Similar comparisons can be made where other plaintiffs suffered horrific injuries. (See, e.g., *Collins v. Union Pacific Railroad Co.* (2012) 207 Cal.App.4th 867, 874 [jury award of $3,500,000 in noneconomic damages reduced to $2,250,000 by the trial court; plaintiff suffered "a fractured jaw, extensive facial laceration, cerebral bleeding (which was resolved prior to discharge from the hospital), multiple fractures of the face near the nose with mouth displacement, swelling of the sinuses at the front of head and base of the skull, a punctured lung, and soft tissue swelling of the throat which required a tracheostomy," which led to severe brain injury and permanent partial disability].)

49

Bigler-Engler argues that a jury verdict in another case involving Breg brought by John Dade Thieriot shows the jury's verdict here was not excessive. The argument is unpersuasive. In that case, a jury awarded Thieriot $3,800,000 in noneconomic damages after he used the Polar Care device on both knees and was injured. (*Thieriot v. Breg, Inc.* (Super. Ct. S.F. City and County, 2006, No. CGC 04-431658).) (The jury's total verdict, including economic damages, was $4,165,509.) After the jury's verdict, Breg agreed to pay Thieriot $4,100,000 on the condition that the jury's verdict be vacated.

As an initial matter, we do not have a record of the evidence admitted at Thieriot's trial, thus undermining its value for comparative purposes, and, of particular import, the award was not tested on appeal. Moreover, Thieriot's economic damages were over $365,000 compared to Engler's economic damages of a little over $68,000, and Thieriot suffered injuries to both knees, not one. Thus, that award has little value in assessing the disproportionality of Engler's award.

The lack of evidence supporting the jury's award and the disproportionality of the award shown by the reported cases discussed above suggest the jury failed to base its award solely on the evidence and was influenced by improper factors. Our detailed review of the record confirms this conclusion. As we have already described, Engler's counsel asked questions about impermissible or excluded matters, suggesting to the jury that they were not hearing all of the relevant evidence, and made comments denigrating the court and defense counsel. (See part II, *ante*.) Key portions of Stern's opening statement and closing argument, as well as witness examinations, concerned injuries suffered by individuals other than Engler. Warner, for example, figured prominently in

50

Stern's arguments and questions. Although the fact of his injury, and some details, were properly admitted (see part I. D, *ante*), the focus on Warner and other injured individuals (and their separate lawsuits) appears to have distracted the jury from the specific injuries at issue in this case. Stern also emphasized Breg's 139 incident reports, leaving the impression that every incident report reflected an injury attributable to defects in Breg's Polar Care device, when, in fact, this conclusion was not supported by the evidence. Stern's focus on other injuries appears to have improperly influenced the jury, leading it to award damages taking into account injuries other than Engler's. (See *Loth, supra*, 60 Cal.App.4th at p. 764.)

In addition, episodes of overheated, emotional rhetoric reinforce our conclusion. This tenor is reflected by two passages in Stern's closing argument. The first likened Chao's testimony that he did not want to "play the blame game" to that of a rapist who says the victim enjoyed the rape: "Now I don't know if it struck you this way but to me it was kind of like after [Chao] got on the stand and said, I'm not going to play the blame game, it was almost like the perpetrator in a rape saying, she liked it. That is why it happened, she liked it. I found it very disturbing." The second argued that Breg's Polar Care device had "branded" at least 139 people like livestock or slaves: "But I thought the second definition was more applicable here. It says an identifying mark burned on livestock, criminals or slaves with a branding iron. Now think about that. Breg in their unconscionable marketing and irresponsible marketing of this product they have left, and we know at least 139 people, they've branded with their product." While counsel are

51

entitled to wide latitude to argue their case, arguments such as these had the potential to inflame the jury. Based on the jury's verdict, we conclude they did so.

Although we have attributed some of counsel's conduct as contributing to the jury's award of excessive damages, we are confident this did not deprive the defendants of a fair trial on liability. The products liability, breach of fiduciary duty, and medical malpractice claims were based on solid, convincing evidence. The fact the jury did not find in favor of Engler on all of her claims reinforces our conclusion the jury discharged its *liability* findings based solely on the evidence and instructions.[21]

For the foregoing reasons, and based on our collective experience, we conclude the jury's award of noneconomic damages was excessive, not supported by the evidence, and motivated by passion or prejudice. Because the record in this matter is sufficiently definite to determine the proper amount of noneconomic damages and we are confident the liability findings are sound, we will exercise our power to remit the award to avoid further delay. (See, e.g., *Buell-Wilson, supra*, 141 Cal.App.4th at p. 555.) The facts underlying this case started with Engler's surgery in 2003, and the complaint was filed in 2006. After years of contentious litigation and a hard-fought, eight-week trial presided over by an experienced judge, the jury rendered its verdict in 2012, and this appeal followed in 2013. Now that more than a decade has passed since Engler's surgery, and in

---

[21] Chao suggests that the jury's damages award shows that the jury's liability verdict should be reversed as well. We disagree. Chao has not cited any authority supporting his contention that a new trial on liability is required when damages are found excessive. We have addressed the specific errors urged by Chao elsewhere in this opinion. They do not justify a general new trial on all liability issues. (See *Buell-Wilson, supra*, 141 Cal.App.4th at p. 555, fn. 9.)

the interests of justice and judicial economy, bringing closure to this matter is appropriate.

At the time of Engler's knee surgery in May 2003, she was an energetic, self-confident and highly motivated young woman whose physical and emotional well-being were dramatically impacted by the injuries caused by the Polar Care device. As the evidence clearly shows, after the first six months, her condition steadily improved and her stress subsided. At trial, nine years after surgery, her scar was still visible, but she described only minimal physical discomfort and limitations and referenced little, if any, emotional distress. In short, she had an excellent recovery, such that her life, with minor inconveniences, had largely returned to normal by 2012. Taking into account all of these factors and her life expectancy of 58 years at trial, we set the total noneconomic damages at $1,300,000, reflecting $650,000 for past noneconomic damages and $650,000 for future noneconomic damages.

The award for past noneconomic damages includes Engler's request at trial for $1,000 per day for the 90 days after Engler's initial surgery and $500 per day for the two six-week periods after her scar revision surgeries, for an amount of $132,000. Although Engler did not specifically request noneconomic damages for the other periods leading up to trial, we conclude the evidence supports an award of approximately $150 per day for this period (the high end of what Engler requested for future noneconomic damages), for an amount of $518,000. At the beginning of the period, the evidence shows that Engler's damages were more than $150 per day, while at the end they were less, leading to a

blended rate of approximately $150. Taken together, the figures total $650,000 in past noneconomic damages, which is the maximum Engler could have received on this record.

We further conclude an equal amount, $650,000, is appropriate for Engler's future noneconomic damages. This amount is somewhat more than half of the low end of the range Engler requested at trial. While the lasting effects of Engler's injuries at the time of trial were relatively minor, the evidence supports the inference that Engler would have suffered these effects for the rest of her life. Engler would also have lived with the memory of her pain and trauma at the hands of a trusted professional. Given this evidence, an award of $650,000 is the maximum Engler could have received on this record.

The jury's noneconomic compensatory damages award is therefore reversed and remitted to $1,300,000, conditioned on Bigler-Engler's acceptance of this reduced amount. If Bigler-Engler does not accept the reduced amount, the trial court should conduct a new trial on this issue.

## B. *Punitive Damages*

Chao contends the jury's punitive damages award against him must be reversed because it violates federal due process principles and is excessive under California law.[22] Although we have concluded that the jury's noneconomic compensatory damages award

---

[22] Breg challenges the jury's punitive damages award against it on similar grounds. However, for reasons we will explain, we conclude the jury's verdict against Breg on Engler's claim for intentional concealment must be reversed. Because the jury made the requisite findings of malice, oppression, or fraud against Breg with respect to this claim only, its reversal compels the reversal of the jury's punitive damages award as to Breg as well. (See part IV. A., *post*.)

54

must be reduced, this conclusion does not automatically lead to the further conclusion that the jury's punitive damages award must be reduced. (*Behr v. Redmond* (2011) 193 Cal.App.4th 517, 536-537; see *Izell v. Union Carbide Corp.* (2014) 231 Cal.App.4th 962, 984.) Although a reduction in compensatory damages may make a punitive damages award more vulnerable to attack (e.g., because the resulting ratio between punitive and compensatory damages is too high), the jury's punitive damages award must be assessed separately according to applicable standards.

In the punitive damages phase of trial, Engler presented evidence that the cumulative net profits from Oasis's Polar Care business from 1992 to 2003 was at least $604,262 based on Oasis's financial statements. Chao did not work for Oasis at the beginning of that period, and other doctors shared in Oasis's profits even after Chao joined. The parties stipulated that Chao's net worth was $3,411,547. An expert witness examined Chao's tax returns and found that Chao had an adjusted gross income of $620,069 in 2009 and $750,726 in 2010. Although the relevant documents were not yet final, based on the available information for 2011 the expert testified that Chao's adjusted gross income for 2011 would be $759,482. In 2011, Chao or his wholly-owned entities also received $1,400,928 in distributions from businesses Chao owned or had an interest in. The witness did not have information on Chao's income for the then-current year, 2012, or forecasts for any future years. An Oasis administrator testified that Oasis was not profitable, and Chao (as its owner) had to contribute money to help Oasis pay its expenses. He noted that Chao had been unable to see patients on occasion because of complications with his wife's pregnancy. (Chao's wife was expecting twins.) The

administrator believed the arrival of the twins would impact the number of patients Chao would be able to see in the future. The jury awarded $500,000 in punitive damages against Chao, by a vote of 10 to two.

"Our Supreme Court has summarized the fundamental principles of punitive damages under California law. The purposes of punitive damages are to punish the defendant and deter the commission of similar acts. [Citations.] Three primary considerations govern the amount of punitive damages: (1) the reprehensibility of the defendant's conduct; (2) the injury suffered by the victims; and (3) the wealth of the defendant." (*Rufo, supra*, 86 Cal.App.4th at pp. 619-620.)

"Because the quintessence of punitive damages is to deter future misconduct by the defendant, the key question before the reviewing court is whether the amount of damages 'exceeds the level necessary to properly punish and deter.' [Citations.] The question cannot be answered in the abstract. The reviewing court must consider the amount of the award *in light* of the relevant facts. The nature of the inquiry is a comparative one. Deciding in the abstract whether an award is 'excessive' is like deciding whether it is 'bigger,' without asking 'Bigger than what?' " (*Adams v. Murakami* (1991) 54 Cal.3d 105, 110 (*Adams*).)

"Even if an award is entirely reasonable in light of the other two factors . . . , the award can be so disproportionate to the defendant's ability to pay that the award is excessive *for that reason alone.*" (*Adams, supra*, 54 Cal.3d at p. 111.) Evidence of a defendant's financial condition and ability to pay any award is therefore crucial in determining whether a punitive damages award is excessive. (*Id.* at p. 110; *Rufo, supra*,

56

86 Cal.App.4th at p. 620.) "[O]bviously, the function of deterrence [citation], will not be served if the wealth of the defendant allows him to absorb the award with little or no discomfort. [Citations.] By the same token, of course, the function of punitive damages is not served by an award which, in light of the defendant's wealth and the gravity of the particular act, exceeds the level necessary to properly punish and deter." (*Neal v. Farmers Insurance Exchange* (1978) 21 Cal.3d 910, 928.)

"Punitive damages constitute a windfall. [Citation.] Such awards generally are not allowed to exceed 10 percent of the net worth of the defendant." (*Michelson v. Hamada* (1994) 29 Cal.App.4th 1566, 1596; see *Storage Services v. Oosterbaan* (1989) 214 Cal.App.3d 498, 515 (*Storage Services*) ["[P]unitive damage awards are generally not allowed to exceed 10 percent of the defendant's net worth, and . . . significantly lower percentages are indeed the norm."].)

Here, the parties stipulated that Chao's net worth was $3,411,547. The jury's award of $500,000 in punitive damages, about 14 percent of Chao's net worth, exceeds the 10 percent threshold. For this reason alone, the jury's award is suspect. "Where, as here, the award represents a disproportionate share of the defendant's net worth, it is presumptively the result of passion and prejudice and cannot be sustained." (*Storage Services, supra*, 214 Cal.App.3d at p. 516.)

Bigler-Engler claims, "Given Chao's utter lack of credibility in other respects, the jury was also free to reject his claims regarding his alleged 'net worth.' " But Chao's net worth was the subject of the parties' stipulation. The jury was *not* free to disregard it. (*Palmer v. City of Long Beach* (1948) 33 Cal.2d 134, 141-142 ["Unless the trial court, in

57

its discretion, permits a party to withdraw from a stipulation [citations], it is conclusive upon the parties, and the truth of the facts contained therein cannot be contradicted."].)

Bigler-Engler points out that net worth may be supplemented by other financial information when a reviewing court considered a defendant's ability to pay. (See *Rufo, supra*, 86 Cal.App.4th at p. 621 ["[A]lthough net worth is the most common measure of wealth used in assessing punitive damages, it is not the exclusive measure."].) Bigler-Engler contends evidence of Chao's income and business distributions shows he is able to pay the jury's punitive damage award. We disagree. The jury's punitive damages award amounts to the bulk of Chao's normal income in the years before the verdict, and the available evidence showed that his income in future years was likely to decrease. Given these facts, the jury's punitive damages award remains suspect. "[T]he purpose of punitive damages is not served by financially destroying a defendant. The purpose is to deter, not to destroy." (*Adams, supra*, 54 Cal.3d at p. 112.)

The remaining two factors are the reprehensibility of the defendant's conduct and the injury suffered by the victim. (*Rufo, supra*, 86 Cal.App.4th at p. 620.) Viewing Chao's actions against the range of possible tortious acts justifying punitive damages, we conclude Chao's actions fall in the lower range of reprehensibility. Distilled to their essence, the facts show that Chao overprescribed the Polar Care device, without adequate warnings of potential harm or disclosures regarding his financial interest, in order to increase his profits. While this conduct certainly justified the imposition of punitive damages, it was not particularly reprehensible. Chao did not intend to harm Engler and, except for Warner, he had successfully treated hundreds of clients with the Polar Care

58

device without incident. Compared with more intentional harm, and more recklessly harmful acts, Chao's actions were much less egregious. Similarly, while Engler suffered significant physical and emotional harm, this harm too is in the low range of the potential harm an individual can suffer. As we have already discussed, the lasting effects of her injury were relatively minor and did not significantly impact her life. The remaining two factors therefore suggest that the maximum punitive damages award supported by the record will be comparatively small.[23]

Taking these three factors into account, we conclude the jury's punitive damages award was excessive as a matter of California law. The $500,000 award strains Chao's ability to pay based on the evidence presented at trial, and it is not justified by the relatively low reprehensibility of his acts or the relatively small harm to Engler. While the award is less than the amount we have determined to be Engler's maximum supportable compensatory damages, it is still excessive in light of the relevant factors. "Although the award represented only a fraction of the compensatory damages, 'the function of punitive damages is not served by an award which, in light of the defendant's

---

[23]    A comparison with *Rufo, supra*, 86 Cal.App.4th 573, is illustrative. In that case, a civil suit arising out of the notorious 1994 murders of Nicole Brown Simpson and Ronald Goldman, a jury found O.J. Simpson liable for their intentional deaths and awarded $25 million in punitive damages. (*Id.* at p. 581.) *Rufo* explained, "In this case the first two factors, the reprehensibility of the defendant's conduct and the severity of harm to the victims, have the greatest weight legally possible. In effect the jury found that Simpson committed two deliberate, vicious murders. This is the most reprehensible conduct that society condemns and is ordinarily punished under California criminal law by a sentence of death or life imprisonment without possibility of parole. [Citations.] The harm suffered by the victims was the maximum possible; they were intentionally killed." (*Id.* at pp. 623-624.)

wealth and the gravity of the particular act, exceeds the level necessary to properly punish and deter.' " (*Storage Services, supra*, 214 Cal.App.3d at p. 515.)

Although we would normally reverse the jury's award and remand for a new trial on that issue, we believe the interests of justice are better served by a remittitur for the reasons we have already discussed in connection with Engler's noneconomic compensatory damages. Based on our review of the record, and in our collective experience, the maximum award of punitive damages supportable by the record is $150,000, or approximately half of the customary 10 percent net worth threshold. This amount does not exceed Chao's ability to pay and adequately serves the purpose of punishing Chao and deterring him from similar conduct in the future.

We have considered Chao's contention that the jury's award is also excessive under the due process clause of the federal Constitution. (*State Farm Mut. Auto. Ins. Co. v. Campbell* (2003) 538 U.S. 408, 417-418; *Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 712.) Even if we were to agree with this contention as well, our analysis under the federal due process clause would not result in a remittitur below $150,000. We therefore need not consider this contention.

We will therefore reverse and remit the jury's punitive damages award to $150,000, conditioned on Bigler-Engler's acceptance of the reduced amount. If Bigler-

Engler does not accept the reduced amount, the trial court should conduct a new trial on that issue.[24]

## IV. *Sufficiency of the Evidence*

### A. *Intentional Concealment Against Breg*

Breg contends the evidence does not support the jury's verdict on Engler's claim for intentional concealment.[25] "[T]he elements of a cause of action for fraud based on concealment are: ' "(1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained

---

[24]    If Bigler-Engler does not accept the reduced amount of noneconomic compensatory damages, and the trial court must hold a new trial on that issue, it must hold a new trial on the issue of punitive damages as well. (*Liodas v. Sahadi* (1977) 19 Cal.3d 278, 284.)

[25]    The various species of fraud are sometimes difficult to separate. To frame our discussion, we reproduce the findings of the jury in its special verdict form on this claim. The jury answered each of the following questions in the affirmative as to Breg: (1) "Did [Breg] intentionally fail to disclose an important fact that Whitney Engler did not know and could not reasonably have discovered?" (2) "Did [Breg] intend to deceive Whitney Engler by concealing the important fact?" (3) "Did Whitney Engler rely on [Breg's] deception and was such reliance reasonable under the circumstances?" (4) "Was [Breg's] concealment a substantial factor in causing harm to Whitney Engler?" (5) "Do you find by clear and convincing evidence that [Breg] engaged in malice, oppression, or fraud, when [it] concealed the important fact with intent to deceive?" The jury was also presented with a claim of intentional misrepresentation. In connection with that claim, the jury found that Breg did not "make a false representation of an important fact" to Engler.

61

damage."...'...." (*Kaldenbach v. Mutual of Omaha Life Ins. Co.* (2009) 178 Cal.App.4th 830, 850 (*Kaldenbach*).)

Based on the evidence presented at trial, Breg argues the second element above, a duty to disclose, is absent here because there was no transactional relationship between Engler and Breg. This court examined the circumstances giving rise to a duty to disclose in *LiMandri v. Judkins* (1997) 52 Cal.App.4th 326 (*LiMandri*). In that case, we explained, "There are 'four circumstances in which nondisclosure or concealment may constitute actionable fraud: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts.' " (*Id.* at p. 336.) Where, as here, a fiduciary relationship does not exist between the parties, only the latter three circumstances may apply. These three circumstances, however, "presuppose[] the existence of some other relationship between the plaintiff and defendant in which a duty to disclose can arise." (*Id.* at pp. 336-337.) "A duty to disclose facts arises only when the parties are in a relationship that gives rise to the duty, such as ' "seller and buyer, employer and prospective employee, doctor and patient, or parties entering into any kind of contractual arrangement." ' " (*Shin v. Kong* (2000) 80 Cal.App.4th 498, 509.)

Our Supreme Court has described the necessary relationship giving rise to a duty to disclose as a "transaction" between the plaintiff and defendant: "In *transactions* which do not involve fiduciary or confidential relations, a cause of action for non-disclosure of

62

material facts may arise in at least three instances: (1) the defendant makes representations but does not disclose facts which materially qualify the facts disclosed, or which render his disclosure likely to mislead; (2) the facts are known or accessible only to defendant, and defendant knows they are not known to or reasonably discoverable by the plaintiff; (3) the defendant actively conceals discovery from the plaintiff." (*Warner Construction Corp. v. City of Los Angeles* (1970) 2 Cal.3d 285, 294, italics added, fns. omitted.) Other cases have described the requisite relationship with the same term. (See, e.g., *Hoffman v. 162 North Wolfe LLC* (2014) 228 Cal.App.4th 1178, 1187 (*Hoffman*); *LiMandri, supra*, 52 Cal.App.4th at p. 337 ["As a matter of common sense, such a relationship can only come into being as a result of some sort of *transaction* between the parties."].) Such a transaction must necessarily arise from direct dealings between the plaintiff and defendant; it cannot arise between the defendant and the public at large.

By contrast, as Bigler-Engler points out, other doctrines impose liability even without evidence of a transaction between plaintiff and defendant. Bigler-Engler relies on the general principle that a manufacturer has a duty to warn consumers of a product's hazards and faults. (*Johnson v. American Standard, Inc.* (2008) 43 Cal.4th 56, 64; *Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1316.) Bigler-Engler argues that this duty applies here as well and the violation of that duty gives rise to a cause of action for fraud under a theory of concealment. The authorities Bigler-Engler cites, however, involve strict products liability, not fraud. Bigler-Engler has not provided any reason to apply this duty to the fraud cause of action here, and we are aware of none. Products liability law involves a set of circumstances, elements, and doctrines that are

63

independent from, and not directly applicable to, fraud. The duties underlying each cannot simply be applied to the other. (Cf. *Conte v. Wyeth, Inc.* (2008) 168 Cal.App.4th 89, 108 ["[W]e do not agree that a suit based on a theory of negligent or intentional misrepresentation is governed by rules developed under the distinct doctrine of strict products liability law."].)

Bigler-Engler also points out that "a duty to speak may arise when necessary to clarify misleading 'half-truths.' " (*Boeken v. Philip Morris, Inc.* (2005) 127 Cal.App.4th 1640, 1659.) "This is because of the principle that 'where one does speak he must speak the whole truth to the end that he does not conceal any facts which materially qualify those stated. [Citation.] One who is asked for or volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.' " (*Pavicich v. Santucci* (2000) 85 Cal.App.4th 382, 398.) As we have explained, however, a duty to disclose arises in this context only where there is already a sufficient relationship or transaction between the parties. (*Warner Construction Corp. v. City of Los Angeles, supra*, 2 Cal.3d at p. 294; *LiMandri, supra*, 52 Cal.App.4th at pp. 336-337.) Where, as here, a sufficient relationship or transaction does not exist, no duty to disclose arises even when the defendant speaks. (*Hoffman, supra*, 228 Cal.App.4th at pp. 1191-1192; see *Platt Electrical Supply, Inc. v. EOFF Electrical, Inc.* (9th Cir. 2008) 522 F.3d 1049, 1059, fn. 3 [applying California law].)

Bigler-Engler correctly asserts that an affirmative statement may be so misleading that it may give rise to a fraud cause of action even where the relationship or transaction would be insufficient to give rise to a generalized duty to disclose. (See *Hoffman, supra*,

228 Cal.App.4th at p. 1192, fn. 14; see also *Goodman v. Kennedy* (1976) 18 Cal.3d 335, 347; *Boeken v. Philip Morris, Inc., supra*, 127 Cal.App.4th at p. 1659.) However, even viewed in the light most favorable to the jury's verdict, the record does not support the finding that Breg made any such statements here. Breg did not make any statements at all directly to Engler or her parents. Nor did Engler or her parents receive any statements directly from Breg. Bigler-Engler points to evidence that the Polar Care device Oasis supplied had a Breg warning label and instructions. Breg, however, had updated its warnings for the Polar Care 500 device at least twice since that Polar Care device had been manufactured. And, as noted, Breg had no knowledge that this Polar Care device (and its associated outdated warnings and directions) had been provided to Engler.

Even assuming the warnings and directions on Engler's Polar Care 500 device could be considered affirmative statements to her or her parents, the evidence does not support the finding that they were so misleading as to give rise to a duty to disclose in the absence of an otherwise sufficient relationship or transaction. Although Breg did not specifically warn of the risk or symptoms of an NFCI (and the warnings were therefore inadequate in the context of products liability, as the jury found), the statements Breg did make were not "misleading 'half-truths' " that may give rise to liability in fraud. Breg specifically included the following warning: "WARNING: A LICENSED HEALTH CARE PRACTITIONER MUST DETERMINE THE CORRECT TEMPERATURE RANGE FOR EACH PATIENT. PATIENTS VARY IN SENSITIVITY TO COLD. A PERIODIC CHECK OF THE TEMPERATURE MUST BE MADE AFTER A FLOW RATE HAS BEEN ESTABLISHED FOR THE PATIENT. CAUTION SHOULD BE

65

TAKEN DURING PROLONGED USE, FOR CHILDREN, DIABETICS, INCAPACITATED PATIENTS, AND THOSE WITH DECREASED SKIN SENSITIVITY OR POOR CIRCULATION."

Likewise, the instructions did not dictate a specific temperature or length of use. The instructions stated, under the heading of "TEMPERATURE ADJUSTMENT," "Turn knob as necessary to obtain desired temperature, clockwise for warmer and counterclockwise for colder. Desired temperature is typically between 45 to 55°F for continuous use and below 45°F for sessions of 20 minutes or less. However, patient comfort and the amount of gauze or other padding between the pad and skin will affect the desired temperature." After those instructions, Breg included another warning: "CAUTION: A LICENSED HEALTH CARE PRACTITIONER MUST DETERMINE THE CORRECT TEMPERATURE RANGE FOR EACH PATIENT."

While a reasonable jury could, and in this case did, find these warnings inadequate for product liability purposes given Breg's knowledge of the risk of NFCI's, these statements are not "misleading 'half-truths' " that give rise to a duty to disclose in the absence of an otherwise sufficient relationship or transaction. To hold otherwise would unduly conflate two distinct areas of law, products liability and fraud, and transform every instance of inadequate product warning into a potential claim for fraud.

Under the circumstances of this case, therefore, Engler was required to offer evidence of a relationship between Engler and Breg that was sufficient to give rise to a duty to disclose. The standard of review for sufficiency of the evidence is well settled: " '[T]he scope of our review begins and ends with the determination whether, on the

66

entire record, there is any substantial evidence, contradicted or uncontradicted, which will support the conclusions reached by the jury. [Citations.] In reviewing the voluminous record, we must examine all factual matters in the light most favorable to the prevailing parties and resolve all conflicts in support of the judgment. [Citations.] [¶] "Substantial" evidence, however, is not synonymous with "any" evidence. To constitute sufficient substantiality to support the verdict, the evidence must be "reasonable in nature, credible, and of solid value; it must actually be 'substantial' proof of the essentials which the law requires in a particular case." [Citations.]' [Citation.] 'It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " (*Kasparian v. County of Los Angeles* (1995) 38 Cal.App.4th 242, 259-260 (*Kasparian*).)

Viewing the record in the light most favorable to Bigler-Engler, we conclude the evidence does not support the jury's verdict. An essential element underlying Engler's claim for intentional concealment, a duty to disclose, is absent here because there was no evidence of a relationship between Engler (or her parents) and Breg sufficient to give rise to a duty to disclose. Breg did not transact with Engler or her parents in any way. Engler obtained her Polar Care device from Oasis, based on a prescription written by Chao, all without the Breg's involvement. The evidence does not show Breg knew—prior to this lawsuit—that Engler was a potential user of the Polar Care device, that she was prescribed the Polar Care device, or that she used the Polar Care device. The evidence also does not show that Breg directly advertised its products to consumers such as Engler or that it derived any monetary benefit directly from Engler's individual rental of the Polar Care device. Indeed, Oasis appears to have obtained the Polar Care device Engler

67

used from Breg several years before Engler's surgery and maintained the device itself for rental to its patients. Under these circumstances, there was no relationship between Breg and Engler (or her parents) sufficient to give rise to a duty to disclose.

Because the evidence does not support the existence of a duty to disclose, the jury's verdict in Engler's favor on her claim for intentional concealment must be reversed. Breg contends it is further entitled to judgment in its favor on this claim. "An appellate court may reverse a judgment with directions to enter a different judgment if it appears from the record that no new evidence of significance would be presented in a new trial and there is only one proper judgment." (*Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 357.) Based on the record and the briefing of the parties, it does not appear that Bigler-Engler could establish the requisite elements of an intentional concealment cause of action against Breg if the claim were retried. This cause of action was the subject of comprehensive discovery and was exhaustively litigated in the trial court. The evidence adduced is simply insufficient to sustain the cause of action. Entry of judgment in Breg's favor is therefore appropriate. (*Ibid.*)

The jury's award of punitive damages against Breg must likewise be reversed. As to Breg, the jury made the necessary finding of malice, oppression, or fraud under Civil Code section 3294 only in connection with Engler's claim for intentional concealment.[26]

---

[26] The record does not reveal why Engler did not ask for findings of malice, oppression, or fraud in connection with her strict products liability and negligence causes of action against Breg. As a general matter, such causes of action may give rise to awards of punitive damages where malice, oppression, or fraud is found. (*West v. Johnson & Johnson Products, Inc.* (1985) 174 Cal.App.3d 831, 867-868; *Grimshaw,*

68

Because that claim has been reversed, the punitive damages award against Breg must be reversed as well. (See *Opsal v. United Services Automobile Association* (1991) 2 Cal.App.4th 1197, 1207.) We therefore need not consider Breg's other challenges to the punitive damages award and related jury instructions.

### B. *Strict Liability and Negligent Failure to Warn Against Oasis*

Oasis contends that the evidence does not support the jury's verdict on Engler's causes of action for strict liability design defect, strict liability failure to warn, and negligent failure to warn.[27] Oasis argues that a required element of each of these claims is that Oasis was a manufacturer or distributor of the Polar Care device and the evidence was insufficient to support a finding on this element. Bigler-Engler does not provide any opposing argument. Reviewing the jury's verdict for substantial evidence (*Kasparian, supra*, 38 Cal.App.4th at pp. 259-260), we agree with Oasis that the jury's verdict as to the strict liability claims must be reversed. However, we conclude Oasis has not shown

---

*supra*, 119 Cal.App.3d at p. 810 ["We find no statutory impediments to the application of Civil Code section 3294 to a strict products liability case based on design defect."]; see *Ehrhardt v. Brunswick, Inc.* (1986) 186 Cal.App.3d 734, 741.) However, without findings on these specific causes of action, the jury's verdicts against Breg on these causes of action cannot support the jury's award of punitive damages against Breg. (See *Myers Building Industries, Ltd. v. Interface Technology, Inc.* (1993) 13 Cal.App.4th 949, 961 ["A jury instruction alone does not constitute a finding. Nor does the fact that the evidence might support such a finding constitute a finding."].)

[27] "California law recognizes separate failure to warn claims under both strict liability and negligence theories." (*Webb v. Special Electric Co., Inc.* (2016) 63 Cal.4th 167, 181.) At trial, Engler asserted a cause of action for negligent *design* only against Breg.

the jury's verdict on Engler's claim of negligent failure to warn was not supported by the evidence.

"A manufacturer or retailer may be held strictly liable for placing a defective product on the market if the plaintiff's injury results from a reasonably foreseeable use of the product. [Citations.] Strict product liability may be premised upon a theory of design defect, manufacturing defect or failure to warn." (*Chavez v. Glock, Inc.* (2012) 207 Cal.App.4th 1283, 1302 (*Chavez*).) "However . . . , strict liability is not imposed even if the defendant is technically a 'link in the chain' in getting the product to the consumer market if the judicially perceived policy considerations are not satisfied. Thus, a defendant will not be held strictly liable unless doing so will enhance product safety, maximize protection to the injured plaintiff, and apportion costs among the defendants." (*Arriaga v. CitiCapital Commercial Corp.* (2008) 167 Cal.App.4th 1527, 1537.)

An important exception to the general rule of strict liability applies to medical providers that use or dispense products as part of their treatment of patients. (*San Diego Hospital Assn. v. Superior Court* (1994) 30 Cal.App.4th 8, 13 (*San Diego Hospital Assn.*) ["California courts have repeatedly held that strict liability may not be imposed against health care providers for injuries suffered by their patients."]; *Silverhart v. Mount Zion Hospital* (1971) 20 Cal.App.3d 1022, 1027-1028 (*Silverhart*); see *Murphy v. E. R. Squibb & Sons, Inc.* (1985) 40 Cal.3d 672, 679 (*Murphy*).) For example, in *Hector v. Cedars-Sinai Medical Center* (1986) 180 Cal.App.3d 493, 506-507 (*Hector*), the court considered whether a hospital could be held strictly liable for defects in a pacemaker it purchased and implanted in a patient. The court concluded that the hospital could not be held

70

strictly liable. "The essence of the relationship between hospital and patient is the provision of professional medical services necessary to effect the implantation of the pacemaker—the patient does not enter the hospital merely to purchase a pacemaker but to obtain a course of treatment which includes implantation of a pacemaker. [Citations.] As a provider of services rather than a seller of a product, the hospital is not subject to strict liability for a defective product provided to the patient during the course of his or her treatment." (*Id.* at p. 504.)

Here, Oasis was primarily a provider of medical services, including knee surgery, to Engler. As part of those services, it offered the Polar Care device for sale or rental. Like the pacemaker in *Hector*, the Polar Care device was prescribed to enhance Engler's medical treatment. Oasis was therefore a provider of medical services rather than a mere seller or renter of the Polar Care device. As such, Oasis cannot be held strictly liable for defects. (*Hector, supra*, 180 Cal.App.3d at pp. 507-508 & fn. 3; see *San Diego Hospital Assn., supra*, 30 Cal.App.4th at p. 13; *Silverhart, supra*, 20 Cal.App.3d at pp. 1027-1028.) The jury's verdicts on Engler's claims for strict liability design defect and strict liability failure to warn must be reversed and judgment entered in Oasis's favor on these claims. (See *Singh, supra*, 186 Cal.App.4th at p. 357; see also *Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 466 (*Sonic Manufacturing*).)[28]

[28]    Oasis argues that evidence relevant only to theories of strict liability should not have been admitted against it if strict liability were not a proper theory. Oasis does not argue that admission of this evidence affected any other claims against it. Because we

71

This exception, however, applies only to causes of action brought under a theory of strict liability. Causes of action based in negligence are not affected. (*San Diego Hospital Assn., supra*, 30 Cal.App.4th at p. 17 ["The hospital remains liable for the consequences of any intentional or negligent acts that have been alleged."]; *Silverhart, supra*, 20 Cal.App.3d at p. 1028 ["Its liability, if any, would depend on whether it was negligent or guilty of intentional misconduct."]; see *Murphy, supra*, 40 Cal.3d at p. 677.) Engler's claim for negligent failure to warn, as its name implies, required Engler to prove that Oasis had acted negligently. (See *Chavez, supra*, 207 Cal.App.4th at p. 1302 [" 'Negligence law in a failure-to-warn case requires a plaintiff to prove that a manufacturer or distributor did not warn of a particular risk for reasons which fell below the acceptable standard of care, i.e., what a reasonably prudent manufacturer would have known and warned about.' "].)

Oasis has not provided any authority in which the medical provider exception to strict liability claims was applied to a claim for negligent failure to warn. Nor has Oasis explained why the exception should be extended in this manner. "Negligence and strict products liability are separate and distinct bases for liability that do not automatically collapse into each other because the plaintiff might allege both when a product warning contributes to her injury." (*Conte v. Wyeth, Inc., supra*, 168 Cal.App.4th at p. 101.) The potential liability under a theory of strict liability is broader than under a theory of negligence. (*Anderson v. Owens-Corning Fiberglas Corp.* (1991) 53 Cal.3d 987, 1002.)

reverse the jury's verdict on Engler's strict liability claims against Oasis, we need not consider any additional prejudice caused by the evidence cited by Oasis on those claims. We consider prejudice to Chao in part VI. A., *post*.

The policy reasons for shielding medical providers like Oasis from strict liability therefore do not apply with the same force to negligence actions. Oasis already faces liability for other types of negligence, including medical negligence, and Oasis has not provided any reason why claims for negligent failure to warn should be treated differently. Liability for negligent failure to warn does not dramatically expand Oasis's exposure under the circumstances here.

Aside from the medical provider exception discussed above, Oasis does not otherwise challenge the sufficiency of the evidence supporting this cause of action. We therefore reject Oasis's argument that the jury's verdict on Engler's claim for negligent failure to warn should be reversed.

### C. *Intentional Concealment and Breach of Fiduciary Duty Against Chao*

Chao contends the evidence does not support the jury's verdict against him on Engler's causes of action for intentional concealment and breach of fiduciary duty. We disagree. As noted, "[t]he elements of a cause of action for fraud based on concealment are: ' "(1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage." ' " (*Kaldenbach, supra*, 178 Cal.App.4th at p. 850.) Similarly, in the context of a claim for breach of fiduciary duty, "a physician has a fiduciary duty to disclose all

73

information material to the patient's decision." (*Moore v. Regents of the University of California* (1990) 51 Cal.3d 120, 129 (*Moore*).)

Chao argues that both claims require that Chao have prior knowledge of the facts he failed to disclose to Engler. Bigler-Engler does not appear to contest this requirement, arguing instead it was satisfied by the evidence. Assuming without deciding that prior knowledge was a requirement of Engler's claims for intentional concealment and breach of fiduciary duty under the circumstances of this case, we agree with Bigler-Engler that it was supported by the evidence here.

Chao focuses on the purported lack of evidence that he knew continuous use of the Polar Care device posed a risk of injury to Engler. Bigler-Engler sets forth evidence supporting this knowledge but also points to evidence of a separate undisclosed fact: Chao's financial interest in Engler's Polar Care device rental. Chao's failure to disclose this information is sufficient to support these causes of action and thus we need not consider whether Chao's knowledge of risk to Engler also supports these claims.

A physician's failure to disclose his financial interest in a prescribed treatment can form the basis of a claim for breach of fiduciary duty. "[A] physician must disclose personal interests unrelated to the patient's health, whether research or economic, that may affect the physician's professional judgment; and . . . a physician's failure to disclose such interests may give rise to a cause of action for performing medical procedures without informed consent or breach of fiduciary duty." (*Moore, supra*, 51 Cal.3d at p. 129.) Similarly, as with any other material fact, intentional concealment of such an interest may be actionable in fraud. (*Kaldenbach, supra*, 178 Cal.App.4th at p. 850.)

74

Here, the evidence showed that Chao was aware of the profits Oasis made as a result of sales and rentals of the Polar Care device. Chao himself benefited from those profits as a shareholder in Oasis. Chao therefore had a financial interest in Engler's rental of the Polar Care device from Oasis. It is undisputed that Chao did not disclose that financial interest to Engler or her parents.

Chao argues that nondisclosure of his financial interest is insufficient to support the jury's verdict on these claims because the instructions provided to the jury stated, in part, that an element of Engler's claim for breach of fiduciary duty was "[t]hat Dr. Chao . . . knowingly acted against Whitney Engler's interests by placing [his] financial interests above patient welfare by failing to disclose [his] economic interest in the rental of the Polar Care device and the possible cold injury to plaintiff that might have resulted from the use of the device. . . ." Chao's argument is unpersuasive. He provides no legal argument or authorities in support. In assessing the sufficiency of the evidence, we assess the evidence against the requirements of law, not the requirements stated in the court's jury instructions. The accuracy of the court's jury instructions is a separate matter that Chao does not raise here. Moreover, the cited jury instruction applied only to Engler's claim for breach of fiduciary duty. The jury instruction regarding concealment did not contain any limitation on the fact that may be concealed, other than it must be "important." Chao has not attempted to show that the evidence did not support the jury's

75

verdict based on nondisclosure of Chao's financial interest. Chao therefore has not shown any error in the jury's verdict on these claims.[29]

### D. *Intentional Misrepresentation Against Chao*

Chao contends the evidence does not support the jury's verdict against him on Engler's claim for intentional misrepresentation. " 'To establish a claim for fraudulent misrepresentation, the plaintiff must prove: "(1) the defendant represented to the plaintiff that an important fact was true; (2) that representation was false; (3) the defendant knew that the representation was false when the defendant made it, or the defendant made the representation recklessly and without regard for its truth; (4) the defendant intended that the plaintiff rely on the representation; (5) the plaintiff reasonably relied on the representation; (6) the plaintiff was harmed; and (7) the plaintiff's reliance on the defendant's representation was a substantial factor in causing that harm to the plaintiff." ' " (*Graham v. Bank of America, N.A.* (2014) 226 Cal.App.4th 594, 605-606.) Again, we review the jury's verdict for substantial evidence. (*Kasparian, supra*, 38 Cal.App.4th at pp. 259-260.)

---

[29] Chao contends the evidence was insufficient to support the jury's finding of malice, oppression, or fraud in connection with these claims. Chao's arguments largely overlap with his arguments regarding the substantive elements of these claims. Although the jury must make this finding by clear and convincing evidence, our standard of review on appeal remains the familiar substantial evidence test. We must determine whether a reasonable jury could make the finding by clear and convincing evidence. (See *Hoch v. Allied-Signal, Inc.* (1994) 24 Cal.App.4th 48, 59-60.) Here, for the reasons we have already explained, the jury could reasonably find by clear and convincing evidence that Chao engaged in fraud, i.e., the intentional concealment of his financial interest in rental of the Polar Care device. The jury's findings are therefore supported by the evidence. (See *Amerigraphics, Inc. v. Mercury Casualty Co.* (2010) 182 Cal.App.4th 1538, 1559-1560.)

Chao identifies the alleged misrepresentations as the following statements: (1) continuous use cold therapy was better than traditional cold therapy; (2) continuous use cold therapy would reduce pain and swelling; (3) continuous use cold therapy would decrease recovery time and risk of infection; and (4) continuous use cold therapy would maximize Engler's return to full function. Chao argues the evidence does not support a finding that Chao knew these statements were false or made these statements recklessly and without regard for their truth. We agree.

The evidence showed Chao had a long positive history with mechanized cold therapy devices. He has prescribed the Polar Care device, and others like it, to hundreds of patients. At trial, Chao testified that he believed mechanized cold therapy, like the Polar Care device, was superior to traditional icing because it provided more coverage of the affected area, allowed for continuous use, and was more convenient. Chao denied reading any articles or receiving any information that continuous use cold therapy was unsafe.

Engler's expert witnesses criticized continuous use cold therapy but did not connect their criticism to Chao's knowledge at the time of Engler's surgery. Engler's experts stated they did not believe continuous use cold therapy would help the healing process (because most published medical studies did not support that conclusion) and that continuous use cold therapy was not better than traditional cold therapy such as a bag of ice. In many cases, however, they relied on published medical studies that postdated Engler's surgery. Engler's expert witnesses also acknowledged that using a cold therapy device may have some beneficial effects, such as reducing pain and swelling. One expert

witness stated that "some . . . doctors" believe cold therapy may help with the healing process or be used even against an infection.

Bigler-Engler does not directly address the falsity of the statements Chao made. Instead, Bigler-Engler points to Chao's experience with Warner. The evidence bearing on this issue, viewed in the light most favorable to the jury's verdicts, shows that before Engler's injury, Chao treated Warner with the Polar Care 500 following Warner's knee surgery. Chao provided Warner with the same instructions regarding continuous use that he provided to Engler. The warnings and instructions on Warner's Polar Care device were the same as those on Engler's. After using the Polar Care device for several weeks, Warner experienced redness, swelling, inflammation, and finally mild necrosis on his knee. Warner saw Chao, who told him to continue using the Polar Care device. Two weeks later, Warner's necrosis worsened. Chao referred Warner to a plastic surgeon, who performed a skin graft to treat Warner's necrosis. Chao watched the procedure, which was highly unusual. Also before Engler's surgery, Warner sued Breg and Chao (as well as others). Chao received Warner's summons and complaint. During the litigation, Warner claimed that his injuries were caused by continuous use of the Polar Care device. Later, after Engler's knee exhibited similar signs of necrosis, Chao told Engler and her parents he had never seen anything like Engler's wound before.

Based on this evidence, the jury could reasonably infer Chao knew, prior to Engler's surgery, that continuous use of the Polar Care 500 posed a risk of harm to her. Continuous use of the Polar Care 500 had injured Warner. Based on the expert testimony in Engler's trial regarding the mechanism of injury in an NFCI, the jury could conclude

78

that Chao knew such an injury could occur in others, including Engler, as well. The jury could conclude that Chao's statement to Engler and her parents that he had not seen an injury like Engler's before, was false. The falsity of the statement could reasonably support the inference that there were in fact similarities between Warner and Engler, that Chao recognized those similarities, and that Chao wanted to minimize and conceal any connection between Warner and Engler.[30]

However, even if Chao recognized that use of the Polar Care device put Engler at some risk of harm, this recognition does not render Chao's preoperative statements false or made in reckless disregard of their truth. The evidence does not show that Chao told Engler or her parents that there was no risk of harm from using the Polar Care device. Instead, Chao made statements regarding the superiority and efficacy of the Polar Care device. The evidence does not support the inference that Chao believed those statements were untrue or that they were made in reckless disregard of their truth. A medical device like the Polar Care may be superior to other treatments and efficacious while also posing a risk of harm. And, as we have discussed, although Engler's experts disagreed about the superiority and efficacy of the Polar Care device, their opinions did not directly bear on Chao's knowledge of falsity or his recklessness with regard to the falsity of his statements to Engler and her parents.

---

[30]   This false statement cannot support the jury's verdict as to Engler's claim for intentional misrepresentation because the evidence does not support the other elements of a claim, including reliance and causation, based on that statement. Chao made the statement after Engler's surgery, after she had decided to rent the Polar Care device, after she used the device continuously for several weeks, and after her knee had already been injured.

To prove intentional misrepresentation, Engler was required to show that Chao was aware of the falsity of his statements to Engler when he made them or that Chao acted in reckless disregard for their probable falsity. (*Engalla v. Permanente Medical Group, Inc*. (1997) 15 Cal.4th 951, 974.) Because the evidence does not support this requirement given the specific statements Chao made, the jury's verdict against Chao for intentional misrepresentation must be reversed. (See *Stone v. Foster* (1980) 106 Cal.App.3d 334, 345-346 (*Stone*).) Judgment on this claim should be entered in Chao's favor. (See *Singh, supra*, 186 Cal.App.4th at p. 357; see also *Sonic Manufacturing, supra*, 196 Cal.App.4th at p. 466.)[31]

E. *Medical Negligence and the Legal Sufficiency of Other Torts Against Chao*

In a variation of his substantial evidence arguments, Chao also challenges the jury's verdicts on Engler's claims of intentional concealment, intentional misrepresentation, and breach of fiduciary duty as not legally cognizable on the facts presented. Chao contends these claims must be pled as medical negligence, not other torts.

In *Cobbs v. Grant* (1972) 8 Cal.3d 229 (*Cobbs*), the Supreme Court considered an analogous issue in the context of the tort of battery: whether a doctor who performs a surgery (to which the patient consents), but who does not disclose a known risk of surgery may be liable for battery if the known risk occurs. (*Id.* at p. 239.) The Supreme Court recognized that the question was a close one, "either prong of which is supportable

_____

[31]    In light of our conclusion, we need not decide whether the evidence supported the jury's finding of malice, oppression, or fraud as to this claim.

by authority, [but] the trend appears to be towards categorizing failure to obtain informed consent as negligence." (*Id.* at p. 240.) "The battery theory should be reserved for those circumstances when a doctor performs an operation to which the patient has not consented. When the patient gives permission to perform one type of treatment and the doctor performs another, the requisite element of deliberate intent to deviate from the consent given is present. However, when the patient consents to a certain treatment and the doctor performs that treatment but an undisclosed inherent complication with a low probability occurs, no intentional deviation from the consent given appears; rather, the doctor in obtaining consent may have failed to meet his due care duty to disclose pertinent information. In that situation the action should be pleaded in negligence." (*Id.* at pp. 240-241.)

This principle has been extended to fraud causes of action based on the same set of facts. "The same policy factors which favor treatment as negligence rather than battery also favor treatment as negligence rather than fraud." (*Stone, supra*, 106 Cal.App.3d at p. 347.) Thus, "where a physician fails to disclose low probability inherent risks and subsequent complications arise due to those risks, the resulting cause of action is one for negligence." (*Ibid.*)

*Stone* recognized, however, that it would be incorrect to conclude "that a physician's preoperative representations may never amount to fraud." (*Stone, supra*, 106 Cal.App.3d at p. 347.) The fraudulent conduct here, as we have discussed, consisted at least in part of Chao's failure to disclose his financial interest in the rental of Engler's Polar Care device. These facts are not analogous to the facts at issue in *Cobbs* and *Stone*.

81

In those cases, the physician failed to disclose low probability inherent risks in a medical procedure. *Cobbs* and *Stone* concluded that this nondisclosure did not affect the patient's consent to the procedure itself; it merely affected the degree of risk accepted by the patient. Here, by contrast, it could reasonably be inferred that Chao's nondisclosure of his financial interest affected Engler's decision to rent the Polar Care device itself. Engler did not merely receive an incomplete disclosure of the risks of a recommended medical treatment (as in *Cobbs* and *Stone*). Instead, the information Chao failed to disclose would reasonably have called into question Chao's recommendation itself. Chao's nondisclosure prevented Engler from fully considering whether Chao's recommendation was worthy of trust. By contrast, mere nondisclosure of a low-probability inherent risk does not call the physician's overall recommendation into question. The patient's trust in the physician's judgment in recommending the medical procedure is not affected in the same way as disclosure of a financial interest. The facts of this case are therefore distinguishable from *Cobbs* and *Stone*, and the jury's verdict on Engler's claim for intentional concealment may not be reversed on this basis.[32]

Chao's claim that the jury's verdict on Engler's claim for breach of fiduciary duty must be reversed is likewise untenable. In *Moore*, as we have explained, the Supreme Court held that a physician's failure to disclose his economic interest in a medical treatment may give rise to a claim for breach of fiduciary duty. (*Moore, supra*, 51 Cal.3d

---

[32] Because we have already concluded the evidence does not support the jury's verdict on Engler's claim for intentional misrepresentation against Chao, we need not decide whether it would be legally viable in light of *Cobbs* and *Stone*.

at p. 129.) *Moore* postdates *Cobbs*; it therefore precludes extending the reasoning in *Cobbs* to a claim for breach of fiduciary duty based on failure to disclose an economic interest. Chao's reliance on the out-of-state opinion in *D.A.B. v. Brown* (Minn.Ct.App. 1997) 570 N.W.2d 168 is unavailing. That court disagreed with *Moore* and determined that a physician's failure to disclose illegal kickbacks was a claim for medical malpractice rather than breach of fiduciary duty under Minnesota law. (*Id.* at pp. 171-172.) We find *Moore* persuasive, and we are bound by it in any event. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)[33]

---

[33] Chao makes several additional cursory substantial evidence arguments. Chao first contends that "there is no substantial evidence that Dr. Chao did not disclose his financial interest." We disagree. While Engler and her parents knew they were renting the Polar Care device from Oasis, the jury could reasonably find they did not know Oasis and Chao profited from the rental. Chao also claims that "based on the negligible amount of money involved, the jury could not rationally conclude that any 'profit' was a substantial factor in Dr. Chao's decision to recommend the [Polar Care] device." But Engler's rental cannot be viewed in isolation; it was part of a profit-making enterprise. There is no evidence that enterprise yielded only "negligible" profits for Oasis and Chao. The jury could reasonably conclude that Chao was motivated to continue this profit-making enterprise when he recommended the Polar Care device to Engler and her parents. Finally, Chao claims that neither Engler nor her parents testified that they would not have rented the Polar Care device if Chao told them of his financial interest or of the risks and symptoms of an NFCI. Chao provides no citations to the record and does not discuss any of the evidence bearing on this issue. The judgment below is presumed to be correct, and Chao has the burden of demonstrating error. Chao cannot do so simply by asserting that no evidence exists to support a particular finding. (See *Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 409.) By failing to adequately discuss the evidence supporting the jury's verdict on this issue, Chao has waived this argument on appeal.

## V. *Jury Instructions*

### A. *Breach of Fiduciary Duty*

Oasis contends the court erred by instructing the jury with a modified version of CACI No. 4101 regarding breach of fiduciary duty. Oasis argues the modified instruction improperly conflated the elements of breach of fiduciary duty with the elements of medical negligence, thereby inaccurately stating the law and confusing the jury. "We independently review a claim of instructional error, as the underlying question is one of law, involving the determination of applicable legal principles." (*Holguin v. DISH Network LLC* (2014) 229 Cal.App.4th 1310, 1319.)

As provided by the court, the instruction at issue read as follows: "Whitney Engler claims that she was harmed by Dr. Chao's and/or Oasis' breach of the fiduciary duty to use reasonable care. To establish this claim, Whitney Engler must prove all of the following: [¶] 1. That Dr. Chao and/or Oasis were Whitney Engler's physician and a medical clinic; [¶] 2. That Dr. Chao and/or Oasis acted on Whitney Engler's behalf for purposes of her medical treatment; [¶] 3. That Dr. Chao and/or Oasis failed to act as a reasonably careful physician and a medical clinic would have acted under the same or similar circumstances by placing their financial interests above patient welfare by failing to disclose their economic interest in the rental of the Polar Care device and the possible cold injury to plaintiff that might have resulted from the use of the device; [¶] 4. That Whitney Engler was harmed; and [¶] 5. That Dr. Chao's and/or Oasis' misconduct was a substantial factor in causing Whitney Engler's harm."

Oasis contends the third element of this instruction was an erroneous statement of law. Oasis argues that Engler's breach of fiduciary duty claim was an intentional tort and the third element impermissibly framed the claim as one for negligence. Oasis's premise is flawed. As Oasis acknowledges in a footnote, breach of fiduciary duty need not be intentional; it can be negligent. (See, e.g., *Moore, supra*, 51 Cal.3d at p. 129 [cause of action for breach of fiduciary duty is equivalent to cause of action for lack of informed consent].) CACI No. 4101 itself states the elements of the cause of action for breach of fiduciary duty under a theory of negligence. Oasis claims that Engler's operative complaint pled her breach of fiduciary duty claim as an intentional tort. Even assuming the operative complaint has any bearing on this issue, we disagree. The complaint alleged intentional acts by Oasis and Chao, but those allegations could also satisfy the elements of a claim for breach of fiduciary duty based on a theory of negligence. Similarly, although the jury's special verdict form contained a heading identifying Engler's claim as an intentional tort, this heading is not determinative. The question here is whether the court's jury instruction accurately stated the law. (See *Bay Guardian Co. v. New Times Media LLC* (2010) 187 Cal.App.4th 438, 462 [" 'In considering a claim of instructional error we must first ascertain what the relevant law provides, and then determine what meaning the instruction given conveys.' "].) The law allows a claim for breach of fiduciary duty to be based in negligence. The court therefore did not err by providing a jury instruction on Engler's claim for breach of fiduciary duty based in negligence.

In a similar vein, Oasis contends the jury's answers in its special verdict were inconsistent. In connection with Engler's claim for breach of fiduciary duty, the jury answered "Yes" to the following question: "Did [Oasis] breach [its] fiduciary duties by failing to disclose material facts to Plaintiff?" By contrast, in connection with Engler's claim for intentional concealment, the jury answered "No" to the following question: "Did [Oasis] intentionally fail to disclose an important fact that Whitney Engler did not know and could not reasonably have discovered?" Oasis argues these questions are "essentially identical" and the jury's answers are therefore inconsistent.

" '[A] special verdict's correctness must be analyzed as a matter of law.' " (*City of San Diego v. D.R. Horton San Diego Holding Co.* (2005) 126 Cal.App.4th 668, 678.) " 'Inconsistent verdicts are " 'against law' " ' and are grounds for a new trial. [Citations.] 'The inconsistent verdict rule is based upon the fundamental proposition that a factfinder may not make inconsistent determinations of fact based on the same evidence.' " (*Id.* at p. 682.) Here, however, Oasis has not shown an inconsistency between the two answers at issue. The questions were materially different: the intentional concealment verdict form required the jury to find that Oasis "*intentionally* fail[ed] to disclose an important fact," while the breach of fiduciary duty cause of action had no such requirement of intentionality. (Italics added.) Oasis has not attempted to show why it could not have

86

been found to have failed to disclose an important fact to Engler but not "intentionally" done so. Oasis has not shown any inconsistency in the jury's verdict requiring reversal.[34]

B. *Learned Intermediary Doctrine*

Breg contends the court erred by refusing to instruct the jury that Breg's strict liability duty to warn could be discharged by adequate warnings to prescribing medical providers—rather than their patients—under the learned intermediary doctrine. "The concept of strict liability imposes legal responsibility for injury upon the manufacturer of a product without proof of negligence based upon a determination that the product is: (1) defectively manufactured, (2) defectively designed, or (3) *distributed without adequate warnings as to its potential for harm*." (*Artiglio v. Superior Court* (1994) 22 Cal.App.4th 1388, 1392, italics added.) This general principle has been interpreted narrowly in connection with some types of medical products available only by prescription. "[I]n the case of prescription drugs, the duty to warn runs *to the physician*, not to the patient." (*Carlin v. Superior Court* (1996) 13 Cal.4th 1104, 1116.) " '[I]f adequate warning of potential dangers of a drug has been given to doctors, there is no duty by the drug

---

[34] Oasis has likewise shown no inconsistency between the jury's finding that Oasis acted with malice, oppression, or fraud in connection with Engler's breach of fiduciary duty claim and the jury's decision not to award punitive damages. A finding of malice, oppression, or fraud does not obligate the jury to award punitive damages. (See *Brewer v. Second Baptist Church of Los Angeles* (1948) 32 Cal.2d 791, 800-801; see also CACI Nos. 3942, 3949.) Nor does this finding show that breach of fiduciary duty must always be an intentional tort. "[P]unitive damages sometimes may be assessed in unintentional tort actions under Civil Code section 3294 . . . ." (*Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 1004.)

87

manufacturer to insure that the warning reaches the doctor's patient for whom the drug is prescribed.' " (*Stevens v. Parke, Davis & Co.* (1973) 9 Cal.3d 51, 65.)

" 'The rationale of the foregoing rule is:  "(1) The doctor is intended to be an intervening party in the full sense of the word.  Medical ethics as well as medical practice dictate independent judgment, unaffected by the manufacturer's control, on the part of the doctor.  (2) Were the patient to be given the complete and highly technical information on the adverse possibility associated with the use of the drug, he would have no way to evaluate it, and in his limited understanding he might actually object to the use of the drug, thereby jeopardizing his life.  (3) It would be virtually impossible for a manufacturer to comply with the duty of direct warning, as there is no sure way to reach the patient." ' " (*Fogo v. Cutter Laboratories, Inc.* (1977) 68 Cal.App.3d 744, 754-755, citation omitted.)

The learned intermediary doctrine, as this rule is known, has been extended in California to implantable medical devices in addition to prescription drugs.  (*Valentine v. Baxter Healthcare Corp*. (1999) 68 Cal.App.4th 1467, 1483.)  "In the case of *prescription drugs* and *implants*, the physician stands in the shoes of the 'ordinary user' because it is through the physician that a patient learns of the properties and proper use of the drug or implant.  Thus, the duty to warn in these cases runs to the physician, not the patient." (*Ibid.*, italics added; see *Plenger v. Alza Corp.* (1992) 11 Cal.App.4th 349, 361, fn. 6.)  Breg has not cited any authority extending the learned intermediary doctrine to medical devices such as the Polar Care 500, which are not implantable, and we are aware of none.

Based on our consideration of the policies underlying the learned intermediary doctrine, and the past cases where it has been considered, we conclude the doctrine does not apply to medical devices such as the Polar Care 500 which require the patient to use and apply the medical device themselves. Unlike prescription drugs (which may have only rudimentary patient instructions, e.g., take by mouth twice daily) or implantable medical devices (which may have no patient instructions at all), medical devices such as the Polar Care 500 are intended to be operated by the patient outside the medical environment. With the Polar Care device, the patient herself must decide to apply the device, position the device correctly on the treatment area, ensure the water flow is appropriate for the desired temperature, and stop using the device if complications develop. All of these actions typically occur at home without the assistance of medical professionals. While a medical professional decides whether a patient would benefit from a medical device such as the Polar Care 500 (and therefore a prescription is required), it is the patient who must play an active role in treating herself with the device, including by operating the device herself.

Moreover, unlike prescription drugs or implantable devices, for which it may be impractical to provide patient-directed warnings, medical devices such as the Polar Care 500 are provided to patients for their use. Warnings and instructions can be provided with, or reflected on, the device itself. Here, as we have noted, Breg included patient instructions and warnings with the Polar Care 500 device. Under these circumstances, the duty to warn runs to the patient as well as the medical professional. The patient-directed warnings are required to inform and assist the patient, who must play an active

89

role in her own treatment with the medical device, as we have discussed. The court did not err by refusing Breg's proposed learned intermediary instruction.

## VI. *Evidentiary Issues*

### A. *Oasis's Changes to Polar Care Device Instructions*

Chao contends that evidence of Oasis's changes to Polar Care device instructions should not have been admitted because it was relevant only to Engler's strict liability claim against Oasis. We have already held that Engler's strict liability claims against Oasis should be reversed. (See part IV. B., *ante*.) Even assuming admission of this evidence was error, however, Chao has not shown prejudice.

"A judgment of the trial court may not be reversed on the basis of the erroneous admission of evidence, unless that error was prejudicial. (Code Civ. Proc., § 475.) The record must show that the appellant 'sustained and suffered substantial injury, and that a different result would have been probable if such error . . . had not occurred or existed. There shall be no presumption that error is prejudicial, or that injury was done if error is shown.' (*Ibid*.) Additionally, article VI, section 13, of the California Constitution provides that a judgment may not be set aside based on the erroneous admission of evidence 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' Evidence Code section 353 reinforces that provision: we may not reverse a judgment 'by reason of the erroneous admission of evidence unless . . . [¶] . . . [¶] . . . the error or errors complained of resulted in a miscarriage of justice.' (Evid. Code, § 353, subd. (b).) 'In civil cases, a miscarriage of justice should be declared only when the

90

reviewing court, after an examination of the entire cause, including the evidence, is of the opinion that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' [Citation.] In making this assessment 'we are not to look to the particular ruling complained of in isolation, but rather must consider the full record in deciding whether a judgment should be set aside.' [Citation.] The appellant bears the burden of establishing that the error was prejudicial." (*Grail Semiconductor, Inc. v. Mitsubishi Electric & Electronics USA, Inc.* (2014) 225 Cal.App.4th 786, 799 (*Grail Semiconductor*).)

Chao claims that introduction of this evidence undermined his defense, but he does not discuss the evidence introduced at trial that would tend to support the jury's verdict. The prejudice of erroneously admitted evidence cannot be assessed in a vacuum; it must be placed in the context of the entire record. Chao has not done so. For example, as discussed in part IV. C., *ante*, Engler's claims for intentional concealment and breach of fiduciary duty were supported by Chao's failure to disclose his financial interest in rental of the Polar Care device, which is an issue that was not affected by the change in instruction. Similarly, Engler's professional negligence claim relied on expert testimony of the applicable standard of care and Chao's actions at the time of Engler's surgery. Chao has not shown it was reasonably probable he would have obtained a different result had the evidence not been admitted. (See *Grail Semiconductor, supra*, 225 Cal.App.4th at p. 799.)

Moreover, the court explicitly instructed the jury that the evidence of Oasis's changes in instructions was admissible only against Oasis. Absent evidence to the

91

contrary, we presume the jury followed the court's instruction. (*Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1415.) The leading questions identified by Chao, and the general misconduct discussed in part II., *ante*, do not show that the jury disregarded the court's instruction. The court's instruction therefore prevented any prejudice to Chao. (*McIntyre v. The Colonies-Pacific, LLC* (2014) 228 Cal.App.4th 664, 675.)

## B. *DME Direct Document*

Oasis contends the court prejudicially erred by allowing testimony regarding a document entitled "DME Direct: A Cash and/or Rental Program for the Direct Delivery of Durable Medical Equipment to Patients" and allowing it to be displayed to the jury. The document itself was not admitted into evidence. The DME Direct document was authored by a Breg employee who had previously worked at Oasis. It was created to encourage medical groups and physicians to sell or rent medical devices like the Polar Care 500. It discussed an unnamed medical group, which was in reality Oasis, and the profits it made selling and renting medical devices. In pretrial proceedings, the trial court ruled that the DME Direct document was admissible against Oasis for the purpose of showing that Oasis made a profit from the sale and rental of Polar Care devices. The financial numbers in the document were redacted.

In his opening statement, Engler's counsel displayed portions of the DME Direct document. In one displayed portion, the document stated, "The DME Direct is a program designed to deliver durable medical equipment such as [continuous passive motion], cold therapy and bracing directly to the patient with a goal of making a profit." Another portion displayed during opening statements read, "DME & The Law: One of the most

common questions that is asked is, 'is this legal?' "  Engler's counsel commented, "If you have to ask, it's probably not legal."  An expert witness called by Engler referenced the DME Direct document, and its stated goal of making a profit, as support for her opinion that Chao and Oasis acted illegally and unethically in prescribing the Polar Care device to patients.

Oasis renewed its objection to the DME Direct document because (1) the author of the DME Direct document was unavailable at trial and did not testify and (2) Oasis had stipulated that it made a profit from the rental of Polar Care devices.  The court determined that the document was inadmissible hearsay in light of the author's unavailability.  However, the court allowed Engler's counsel to continue to reference it in witness examinations and display portions of it during closing arguments.

Assuming it was error for the trial court to allow Engler to display, read, and otherwise reference portions of the DME Direct document during trial, and assuming that Oasis's objection to the document was effectively preserved, we conclude Oasis has not shown prejudice.  Prejudice is shown where it is reasonably probable that a result more favorable to the appealing party would have been reached absent the error.  (*Grail Semiconductor, supra*, 225 Cal.App.4th at p. 799.)  Oasis contends it was prejudiced because the DME Document allowed Engler's expert witnesses and her counsel to argue that Oasis rented Polar Care devices with the goal of making a profit.  But Oasis does not compare this allegedly impermissible argument to the other evidence admitted at trial or explain how the jury's verdict would have been different if the DME Document had not been discussed.  We note the jury could have reasonably inferred that Oasis had a goal of

93

making a profit on its sale and rental of the Polar Care devices based on other properly

admitted evidence, including Oasis's stipulation that it made such a profit. Oasis points

to comments by the trial court during a hearing on posttrial motions that Oasis worked

with Breg to develop and market the Polar Care device. The court does not reference the

DME Direct document or distinguish it from other evidence introduced at trial. The

court's comments are insufficient to show prejudice. Even assuming the court erred by

allowing the limited introduction of the DME Direct document, Oasis has not shown the

error was prejudicial.

## VII. *Additional Damages Issues*

### A. *MICRA*

Chao and Oasis contend MICRA limits Engler's noneconomic damages recovery

to $250,000. Although we have concluded that the jury's noneconomic damages award

must be modified (see part III., *ante*), we consider this issue because the modified amount

of $1,300,000 still exceeds the $250,000 MICRA threshold and to give guidance to the

trial court should Bigler-Engler accept this reduced amount.

MICRA addressed a number of perceived flaws in civil actions against health care

providers. The relevant provision here imposes a $250,000 cap on noneconomic

damages "[i]n any action for injury against a health care provider based on professional

negligence[.]" (Civ. Code, § 3333.2, subds. (a), (b).) The statute defines professional

negligence as "a negligent act or omission to act by a health care provider in the

rendering of professional services, which act or omission is the proximate cause of

personal injury or wrongful death, provided that such services are within the scope of

94

services for which the provider is licensed and which are not within any restriction imposed by the licensing agency or licensed hospital." (*Id.*, § 3333.2, subd. (c)(2); see *Flores v. Presbyterian Intercommunity Hospital* (2016) 63 Cal.4th 75, 84-85.)

"The cap on damages under Civil Code section 3333.2 applies to injuries 'based on professional negligence,' i.e., medical treatment falling below the professional standard of care." (*Barris v. County of Los Angeles* (1999) 20 Cal.4th 101, 113 (*Barris*).) However, "MICRA's reference to actions based on 'professional negligence' is not strictly limited to classic sponge-in-the-patient medical malpractice actions . . . ." (*Waters v. Bourhis* (1985) 40 Cal.3d 424, 432-433 (*Waters*).) For example, in *Barris*, the Supreme Court held that a claim against a hospital for failure to stabilize an emergency medical condition under the federal Emergency Medical Treatment and Active Labor Act (EMTALA; 42 U.S.C. § 1395dd(e)(3)(A)) was subject to MICRA's damages cap. (*Barris, supra*, 20 Cal.4th at p. 105.) "[T]he elements of a civil claim for failure to stabilize include the following: (1) the hospital had actual knowledge that a patient was suffering from an 'emergency medical condition'; and (2) did not . . . provide for necessary stabilizing treatment before transfer or discharge, i.e., the transfer or discharge was not medically reasonable under the circumstances; and (3) the patient suffered personal harm as a direct result." (*Id.* at p. 110.) Because the claim ultimately rests on proof the hospital did not meet the prevailing standard of care, and does not require proof of an improper motive, the Supreme Court concluded, "A claim under EMTALA for failure to stabilize is thus necessarily 'based on professional negligence' within the meaning of MICRA—it involves 'a negligent . . . omission to act by a health care provider in the rendering of

95

professional services' (Civ. Code, § 3333.2, subds. (a), (c)(2))—although it requires more." (*Ibid.*) The "more" referenced by the Supreme Court is the hospital's actual knowledge of an emergency medical condition (*ibid.*), which is an additional element but which does not change the nature of the claim, i.e., negligence.

The fact that a plaintiff has brought a medical negligence claim, or that the same facts would support a medical negligence claim as well as other claims, does not mean those other claims will necessarily be subject to MICRA. "It is settled that additional causes of action may arise out of the same facts as a medical malpractice action that do not trigger MICRA." (*Unruh-Haxton v. Regents of University of California* (2008) 162 Cal.App.4th 343, 352 (*Unruh-Haxton*).) A court must determine whether MICRA is triggered based on the specific cause of action and MICRA provision at issue. (*Id.* at p. 353; see *Barris, supra*, 20 Cal.4th at p. 116.)

Oasis contends the remaining causes of action against it—medical malpractice, negligent failure to warn, and breach of fiduciary duty—are "based on professional negligence" and subject to MICRA's noneconomic damage cap under Civil Code section 3333.2. We agree. Medical malpractice is the quintessential cause of action for professional negligence against a health care provider. Engler's cause of action for negligent failure to warn likewise rests on Oasis's negligence in rendering professional services, i.e., its prescription and dispensation of the Polar Care 500 to Engler without adequate warnings, and therefore falls within Civil Code section 3333.2 as well. On this record, Engler's claim for breach of fiduciary duty is equivalent to a cause of action for lack of informed consent, also a form of professional negligence. (*Moore, supra*, 51

96

Cal.3d at p. 129; see part V. A., *ante*.) These causes of action are therefore subject to MICRA's noneconomic damage cap.

Similarly, Chao contends the causes of action against him—medical malpractice, breach of fiduciary duty, and intentional concealment—are subject to MICRA's noneconomic damage cap. We agree as to Engler's claims for medical malpractice and breach of fiduciary duty for the reasons we have stated with respect to Oasis. However, we disagree that MICRA's noneconomic damage cap applies to Engler's cause of action for intentional concealment. That cause of action rests not on any negligent act or omission by Chao, but on Chao's intentional conduct. "[T]here is nothing in the legislative history generally, or with regard to [Civil Code] section 3333.2 specifically, to suggest that the Legislature intended to extend the $250,000 limitation to intentional torts." (*Perry v. Shaw* (2001) 88 Cal.App.4th 658, 668 (*Perry*).) Although *Perry* limited its holding to the battery claim at issue in that case, the application of its reasoning here is clear: an intentional tort is not based on a "negligent act or omission" as required by the statute. (Civ. Code, § 3333.2, subd. (c)(2); see *Perry*, at p. 668 ["In that context, the only rational conclusion is 'that the words "negligent" and "negligence" were carefully chosen to apply only to causes of action based upon negligence.' "]; see also *Waters, supra*, 40 Cal.3d at p. 437 [holding that intentional tort based on sexual misconduct was "of course, . . . not subject to . . . the $250,000 limit on noneconomic damages" even though claim for professional negligence had also been pled]; *Unruh-Haxton, supra*, 162 Cal.App.4th at p. 355 ["Based on our review of the complaints, we conclude the patients'

97

claims for fraud, conversion, and intentional infliction of emotional distress related to wrongful intentional conduct, not mere negligence."].)

Chao relies on authority interpreting other MICRA and related provisions that apply more broadly. (See, e.g., *Central Pathology Service Medical Clinic, Inc. v. Superior Court* (1992) 3 Cal.4th 181, 192-193 (*Central Pathology*) [holding that plaintiffs' cause of action for fraud "aris[es] out of the professional negligence of a health care provider" for purposes of Code of Civil Procedure section 425.13].) However, "[b]ecause [Code of Civil Procedure] section 425.13 is not part of MICRA and employs different language than MICRA's statutes, the Supreme Court repeatedly has rejected attempts to apply the standard it announced in *Central Pathology* to MICRA or other statutory provisions." (*Larson v. UHS of Rancho Springs, Inc.* (2014) 230 Cal.App.4th 336, 350, citing *Delaney v. Baker* (1999) 20 Cal.4th 23, 39-40 and *Barris, supra*, 20 Cal.4th at pp. 115-116.)

We decline Chao's invitation to extend MICRA's noneconomic damage cap to Engler's cause of action for intentional concealment. The damage cap expressly applies to actions "based on professional negligence," i.e., acts or omissions falling below the applicable standard of care. Engler's cause of action for concealment does not require proof of a standard of care. Instead, it requires proof of failure to disclose and, most critically, intent to deceive. It is not based on mere negligence. "[W]e have no reason to conclude the 'Legislature intended to exempt intentional wrongdoers from liability by treating such conduct as though it had been nothing more than mere negligence.' " (*Unruh-Haxton, supra*, 162 Cal.App.4th at p. 356.) Similarly, we have no reason to

98

conclude the Legislature intended to impose a noneconomic damages cap on fraudulent conduct merely because it occurred during medical treatment.

## B. *Proposition 51*

Breg and Oasis contend Proposition 51, codified at Civil Code section 1431 et seq., should apply to limit their liability for Engler's noneconomic damages in proportion to their comparative fault as found by the jury. Again, although we will reverse the jury's noneconomic damages award (see part III., *ante*), we must address this issue to give guidance to the trial court should Bigler-Engler accept the reduced amount of noneconomic damages.

"Proposition 51 modified the traditional common law ' "joint and several liability" ' doctrine to limit an individual tortfeasor's liability for noneconomic damages to a proportion of such damages equal to that tortfeasor's comparative fault." (*Miller v. Stouffer* (1992) 9 Cal.App.4th 70, 82.) The relevant statute provides as follows: "In any action for personal injury, property damage, or wrongful death, based upon principles of comparative fault, the liability of each defendant for non-economic damages shall be several only and shall not be joint. Each defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate judgment shall be rendered against that defendant for that amount." (Civ. Code, § 1431.2, subd. (a).) "Thus, in an action subject to Proposition 51, each tortfeasor remains jointly and severally liable to the plaintiff for economic damages, but is liable to the plaintiff for only its proportionate share of noneconomic damages." (*Bostick v. Flex Equipment Co.* (2007) 147 Cal.App.4th 80, 90 (*Bostick*).)

The jury here determined that Chao was 50 percent responsible for Engler's harm, Oasis was 10 percent responsible, and Breg 40 percent responsible. Oasis and Breg argue that Proposition 51 requires any noneconomic damages award against them be limited to their proportionate responsibility as determined by the jury. Bigler-Engler does not respond. We conclude that Proposition 51 requires apportionment under the circumstances here.

In *Safeway Stores, Inc. v. Nest-Kart* (1978) 21 Cal.3d 322 (*Safeway Stores*), the Supreme Court considered "whether the comparative fault principle . . . should be utilized as the basis for apportioning liability between two tortfeasors, one whose liability rests upon California's strict product liability doctrine and the other whose liability derives, at least in part, from negligence theory." (*Id.* at p. 325.) The Supreme Court determined that principles of strict liability were compatible with apportionment according to fault: "Nothing in the rationale of strict product liability conflicts with a rule which apportions liability between a strictly liable defendant and other responsible tortfeasors." (*Id.* at p. 330.) Although strict liability and negligence theories are doctrinally very different, any difficulties apportioning liability "are more theoretical than practical, and experience in other jurisdictions demonstrates that juries are fully competent to apply comparative fault principles between negligent and strictly liable defendants." (*Id.* at p. 331.) The Supreme Court also concluded that a policy of apportionment avoided unjust results: "Thus, if we were to hold that the comparative indemnity doctrine could only be invoked by a negligent defendant but not a strictly liable defendant, a manufacturer who was actually negligent in producing a product would frequently be placed in a better position

100

than a manufacturer who was free from negligence but who happened to produce a defective product, for the negligent manufacturer would be permitted to shift the bulk of liability to more negligent cotortfeasors, while the strictly liable defendant would be denied the benefit of such apportionment." (*Id.* at p. 332.) This court applied these principles in *Yamaha Motor Corp. v. Paseman* (1990) 219 Cal.App.3d 958 (*Yamaha Motor*), where we allowed a strict products liability defendant to file a cross-complaint for indemnity against a third party whose alleged negligence also contributed to plaintiff's injury. (*Id.* at p. 971-972.)

Although *Safeway Stores* and *Yamaha Motors* involved indemnity actions, rather than an application of Proposition 51, their reasoning supports apportionment here as well. "The express purpose of Proposition 51 was to eliminate the perceived unfairness of imposing 'all the damage' on defendants who were 'found to share [only] a fraction of the fault.' ([Civ. Code,] § 1431.1, subd. (b).)" (*DaFonte v. Up-Right, Inc.* (1992) 2 Cal.4th 593, 603 (*DaFonte*).) "In sum, [Civil Code] section 1431.2 plainly limits a defendant's share of noneconomic damages to his or her own proportionate share of comparative fault." (*Id.* at p. 604.) "With respect to these noneconomic damages, the plaintiff alone now assumes the risk that a proportionate contribution cannot be obtained from each person responsible for the injury." (*Id.* at p. 600.)

Moreover, "neither principles of comparative fault nor the policy underlying Proposition 51 requires it to be interpreted to exclude its application in the strict liability context." (*Arena v. Owens-Corning Fiberglas Corp.* (1998) 63 Cal.App.4th 1178, 1196 (*Arena*); see *Wilson v. John Crane, Inc.* (2000) 81 Cal.App.4th 847, 855 ["The repeated

101

judicial application of the term 'comparative fault' to claims and proceedings involving strict products liability strongly suggests, if it does not prove, that the voters intended the term [in Proposition 51] (or must be deemed to have intended it) to encompass such claims."].)  In *Arena*, the court held "that Proposition 51 is applicable in a strict liability asbestos exposure case where multiple products cause the plaintiff's injuries and the evidence provides a basis to allocate liability for noneconomic damages between the defective products."  (*Arena*, at p. 1198.)  If Proposition 51 is applicable to multiple defendants held liable based on a theory of strict liability, it follows that it is similarly applicable where, as here, one defendant is held liable in part on a theory of strict liability and another defendant is held liable on theories of negligence.[35]

In sum, *Safeway Stores* established that where, as here, one responsible party is liable under a negligence theory (Oasis) and another responsible party is liable at least in part under a strict liability theory (Breg), a jury may still determine their comparative fault.  Proposition 51 requires that a defendant's liability not exceed its comparative fault.  Taken together, these principles compel the conclusion that Oasis and Breg's responsibility for Engler's noneconomic damages must be limited to their proportionate responsibility as determined by the jury:  10 percent for Oasis and 40 percent for Breg.

---

[35]    This case does not present a situation where several defendants in the chain of distribution seek apportionment under Proposition 51 based on their relevant fault for injuries caused by a single defective product.  In such a situation, courts have held that Proposition 51 does not apply and each defendant is liable for the plaintiff's full noneconomic damages under traditional principles of joint and several liability.  (*Bostick, supra*, 147 Cal.App.4th at p. 95; *Wimberly v. Derby Cycle Corp.* (1997) 56 Cal.App.4th 618, 633.)

## C. *Intersection of MICRA and Proposition 51*

As we have explained, MICRA and Proposition 51 apply in various ways to Engler's causes of action. To provide guidance to the trial court on remand, we will discuss the calculations required to apply both limitations.

As to Breg, Proposition 51 limits its liability for Engler's noneconomic damages to 40 percent of the total. (Civ. Code, § 1431.2, subd. (a); *Bostick, supra*, 147 Cal.App.4th at p. 90.) If Bigler-Engler accepts this court's reduction in noneconomic damages, Breg's liability for those damages would be 40 percent of $1,300,000, or $520,000.

As to Oasis, both MICRA and Proposition 51 apply. As noted, we requested supplemental briefing regarding the interplay between MICRA and Proposition 51 under the circumstances here, where a single defendant (Oasis) is subject to the MICRA damages cap.[36] Oasis argues, consistent with our initial opinion, that MICRA applies first to limit Oasis's liability for noneconomic damages to a maximum of $250,000, and then Proposition 51 applies to limit Oasis's liability to 10 percent of that maximum or $25,000. Bigler-Engler argues that Proposition 51 applies first to limit Oasis's liability to 10 percent of Engler's noneconomic damages. Assuming that Bigler-Engler accepts this court's reduction in noneconomic damages, and no other circumstances come into play, Oasis's liability under Proposition 51 would be $130,000. In Bigler-Engler's view, because that amount is below the $250,000 MICRA cap, MICRA does not apply at all.

---

[36]    Our analysis would be different if multiple defendants were subject to the MICRA damages cap, as we will explain below. (See *Mayes v. Bryan* (2006) 139 Cal.App.4th 1075 (*Mayes*); *Gilman v. Beverly Cal. Corp.* (1991) 231 Cal.App.3d 121 (*Gilman*).)

Oasis's liability for noneconomic damages would remain $130,000. For reasons we will explain, we agree with Bigler-Engler.

"In any action for injury against a health care provider based on professional negligence," the MICRA cap applies to "the amount of damages for noneconomic losses," limiting such damages to $250,000. (Civ. Code, § 3333.2, subds. (a), (b).) " '[D]amages,' " in this context, "are limited to amounts awarded by a court." (*Rashidi v. Moser* (2014) 60 Cal.4th 718, 726 (*Rashidi*).) The MICRA cap has no effect on the jury's verdict itself or the amount determined to be a plaintiff's true noneconomic losses. (See *Atkins v. Strayhorn* (1990) 223 Cal.App.3d 1380, 1393, fn. 8 (*Atkins*) ["Although that section directly affects the final *judgment*, it is irrelevant to the jury's *verdict*."].) " '[T]he $250,000 limitation established by MICRA represents the Legislature's attempt to cap noneconomic damages and does not reflect a legislative determination that a person injured as a result of medical malpractice does not suffer such damages.' [Citation.] The $250,000 cap, then, is not a legislative attempt to estimate the true damages suffered by plaintiffs, but rather an attempt to control and reduce medical malpractice insurance costs by placing a predictable, uniform limit on the defendant's liability for noneconomic damages." (*Salgado v. County of Los Angeles* (1998) 19 Cal.4th 629, 641 (*Salgado*).)

MICRA "limit[s] the *recovery* rather than the value of noneconomic damages as a means of protecting the insurability of health care providers. This result is consistent with the Legislature's power to control the measure of damages a plaintiff is entitled to *receive* [citation] while accomplishing its cost-cutting goal in a ' "reasonable" manner.' " (*Atkins, supra*, 223 Cal.App.3d at p. 1393.)

Proposition 51, by contrast, reflects the Legislature's desire to apportion noneconomic damages according to fault, thereby valuing a defendant's responsibility for and contribution to the plaintiff's noneconomic damages.  (See Civ. Code, § 1431.2, subd. (a) ["Each defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate judgment shall be rendered against that defendant for that amount."].)  It "adopts a rule of several liability for *noneconomic* damages, providing that each defendant is liable for only that portion of the plaintiff's noneconomic damages which is commensurate with that defendant's degree of *fault* for the injury."  (*Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1198, second italics added.)

Proposition 51 therefore determines a defendant's *liability* for noneconomic damages, according to that defendant's fault, whereas MICRA establishes a cap on the *recovery* of such damages for certain defendants.  Because the applicability of MICRA's cap cannot be determined unless a defendant's liability is known, Proposition 51 logically must apply first.  If one defendant is subject to the MICRA cap, and that defendant's liability, as determined by the jury's determination of noneconomic loss and proportionate fault, exceeds $250,000, a trial court must apply the MICRA cap to limit any judgment against that defendant to that amount.  If the defendant's liability does not exceed $250,000, the MICRA cap does not apply.

This conclusion is consistent with MICRA's primary goal, establishing "a predictable, uniform limit on the defendant's liability for noneconomic damages." (*Salgado, supra*, 19 Cal.4th at p. 641.)  The MICRA damages cap is not concerned with

105

the manner in which a plaintiff's noneconomic losses and a defendant's liability are determined, but with the ultimate result. It is a blunt but effective instrument to ensure that a defendant's liability for noneconomic damages will not exceed $250,000, whatever the jury's verdict and generally applicable principles would otherwise dictate. (See *Fein v. Permanente Medical Group* (1985) 38 Cal.3d 137, 163 [noting that the Legislature was concerned with controlling "only the very large noneconomic damages awards," not "the more modest recoveries for pain and suffering and the like in the great bulk of cases"].)

In *Francies v. Kapla* (2005) 127 Cal.App.4th 1381 (*Francies*), for example, the trial court after a bench trial found that the defendant, a medical doctor, was two-thirds responsible for the plaintiff's losses and a nonparty (not a medical provider) was one-third responsible. (*Id.* at p. 1387.) The trial court found that the plaintiff's total noneconomic losses were $425,000. (*Id.* at p. 1386.) Because the defendant was a medical provider, the trial court reduced the noneconomic losses to $250,000 and then applied Proposition 51 to further reduce the plaintiff's recoverable damages to two-thirds of that amount. (*Id.* at pp. 1386-1387.) The *Francies* court concluded this was error: "The MICRA cap limits the amount of noneconomic damages for which [defendant] may be held responsible to $250,000, but if he is responsible for noneconomic damages in that amount (or more), MICRA provides no justification for reducing the damages for which he may be held liable below that amount because a third party to whom MICRA does not apply was also partially at fault." (*Id.* at p. 1388.) "In the present case, [defendant] was found responsible for two-thirds of [plaintiff's] noneconomic damages of $425,000, or some $283,000. Since this amount exceeds the MICRA limit of $250,000, his liability for

these damages should have been capped at $250,000. There was no basis, however, to further reduce his liability for noneconomic damages." (*Id.* at p. 1389.)

Although *Francies* involved a responsible nonparty, whereas Chao and Breg are parties, the logic of *Francies* applies equally here. Proposition 51 operates to reduce Oasis's liability for Engler's noneconomic damages to 10 percent of $1,300,000, or $130,000. Because that amount does not exceed MICRA's cap, there is no reason to further reduce the award.

Oasis points to authorities that consider a different situation, where several health care providers are liable for a plaintiff's noneconomic damages and subject to MICRA's damages cap. (*Mayes, supra*, 139 Cal.App.4th 1075; *Gilman, supra*, 231 Cal.App.3d 121.) In such a situation, these authorities found, the MICRA cap limits a plaintiff's recovery against all liable health care providers collectively to $250,000. If the health care providers collectively are found to be liable for an amount exceeding $250,000, the MICRA cap applies and must be apportioned between them according to their relative faults. (See *Mayes, supra*, 139 Cal.App.4th at pp. 1101, fn. 16, 1102; *Gilman, supra*, 231 Cal.App.3d at p. 129.)

Here, however, Oasis is the only liable party subject to MICRA's damages cap. Breg is not a health care provider, and as we have explained, the judgment against Chao is not subject to the MICRA cap based on the jury's intentional concealment verdict against him. Because the liability of the MICRA defendants (i.e., Oasis) is less than the MICRA cap, no apportionment is warranted. (See *Francies, supra*, 127 Cal.App.4th at p. 1389 ["*Gilman* thus turns on the fact that the third party who shared responsibility for the

107

plaintiff's injury was also a health care provider, making it necessary, in effect, to apportion the $250,000 MICRA limit. In the present case, however, [the defendant] is the only responsible party subject to the MICRA cap and MICRA provides no reason to reduce his liability for noneconomic damages below that cap."].) Indeed, any theoretical apportionment of the MICRA cap based on the relative faults of Oasis and Chao would serve only to reduce Oasis's liability below the amount for which it is responsible based on the jury's allocation of fault. This result would go beyond MICRA's intended purpose as a predictable *limit* on noneconomic damages because, even without apportionment, Oasis's liability is well below the MICRA limit. The result would benefit Oasis at the expense of Bigler-Engler, who would have to seek recovery of the difference in damages ($130,000 versus $25,000) from Chao exclusively, rather than both Oasis and Chao. Given MICRA's limited purpose, we do not believe such a result was intended.

Oasis also cites our Supreme Court's decision in *Rashidi, supra*, 60 Cal.4th 718. In *Rashidi*, the Supreme Court considered "whether a jury's award of noneconomic damages, reduced by the court to $250,000 under MICRA, may be further diminished by setting off the amount of a pretrial settlement attributable to noneconomic losses, even when the defendant who went to trial failed to establish the comparative fault of the settling defendant." (*Id.* at p. 720.) The Supreme Court held that no offset was warranted because, in the absence of a finding of fault against the settling defendants, the defendant who went to trial was solely responsible for the damages awarded by the jury. (*Ibid.* ["It would be anomalous to allow a defendant to obtain a setoff against damages for which he is solely liable."].) The Supreme Court rejected the defendant's argument that MICRA

applied to the settlement amounts and jury's verdict collectively. Instead, the Supreme Court held, "[o]nly noneconomic damages awarded in court are actually capped." (*Id.* at p. 721; see *id.* at p. 727 ["We conclude that the cap imposed by section 3333.2, subdivision (b) applies only to judgments awarding noneconomic damages."].)

After reaching this conclusion, the Supreme Court stated, "Had [defendant] established any degree of fault on his codefendants' part at trial, he would have been entitled to a proportionate reduction in the *capped* award of noneconomic damages." (*Rashidi, supra*, 60 Cal.4th at p. 727, italics added.) Because the "codefendants" in *Rashidi* included both a health care provider (potentially subject to MICRA) and a non-health care provider (not subject to MICRA), Oasis interprets *Rashidi* to require that the MICRA cap be imposed first and then this "capped award" may be further reduced by allocations of fault under Proposition 51, regardless of whether the other parties at fault are health care providers. Under Oasis's interpretation, the award here should first be reduced to $250,000 to achieve the "capped award" referenced in *Rashidi*, which would then be reduced to $25,000 to account for the jury's allocation of 90 percent fault to parties other than Oasis.

We agree that this statement from *Rashidi* supports such a result, and we relied on *Rashidi* in our initial opinion to limit Oasis's liability to 10 percent of the $250,000 MICRA cap, or $25,000. Upon further reflection, however, we conclude this statement from *Rashidi* is dictum, since it expressed views on a factual situation not before the Supreme Court (i.e., the result *if* the nonsettling defendant had proved fault on the part of the settling defendants) and was therefore not necessary for its decision. (See *Gogri v.*

109

*Jack in the Box Inc.* (2008) 166 Cal.App.4th 255, 272 [" 'Only statements necessary to the decision are binding precedents . . . .' [Citation.] 'The doctrine of precedent, or stare decisis, extends only to the ratio decidendi of a decision, not to supplementary or explanatory comments which might be included in an opinion.' "].)

As an intermediate appellate court, we do not lightly disregard dictum from our Supreme Court. " 'Even if properly characterized as dictum, statements of the Supreme Court should be considered persuasive. [Citation.]' " (*Hubbard v. Superior Court* (1997) 66 Cal.App.4th 1163, 1169.) "When the Supreme Court has conducted a thorough analysis of the issues and such analysis reflects compelling logic, its dictum should be followed." (*Ibid.*) The statement in question from *Rashidi*, however, is fleeting. It does not consider the line of appellate authorities discussed above, and the court had no need to set forth its reasoning supporting its conclusion that the "capped amount" should be reduced by findings of fault against other parties under Proposition 51, even if the finding of fault is against a defendant not subject to the MICRA damages cap. Under these circumstances, we do not find *Rashidi*'s dictum persuasive, and we decline to follow it. (See *Gogri v. Jack in the Box Inc., supra*, 166 Cal.App.4th at p. 273.)

In sum, because Oasis's liability for Engler's noneconomic losses as determined by the jury (and reduced herein) is below MICRA's damages cap, the MICRA cap is not implicated. A judgment against Oasis for $130,000 in noneconomic damages does not violate MICRA and need not be further reduced.

110

VIII.  *Bigler-Engler's Appeal:  Code of Civil Procedure Section 998*

Bigler-Engler contends the trial court erred by granting Chao's motion to tax costs claimed under Code of Civil Procedure section 998.  The court determined that Engler's settlement offer did not comply with that statute because it did not include an acceptance provision.  (Code Civ. Proc., § 998, subd. (b).)  Although we will reverse the jury's compensatory damages award in part and remit the award conditioned on Bigler-Engler's acceptance of the reduced amount, we consider this issue to provide guidance to the trial court on remand and because the modified amount still exceeds Engler's settlement offer of $1,000,000.  We review the court's determination under Code of Civil Procedure section 998 de novo.  (*Rouland v. Pacific Specialty Ins. Co.* (2013) 220 Cal.App.4th 280, 285 (*Rouland*).)

The statute provides, in relevant part, as follows:  "The written offer shall include a statement of the offer, containing the terms and conditions of the judgment or award, and *a provision that allows the accepting party to indicate acceptance of the offer by signing a statement that the offer is accepted*."  (Code Civ. Proc., § 998, subd. (b), italics added.)  It is well settled that if an offer fails to include an acceptance provision, the offering party may not obtain the benefits of the statute.  (*Boeken v. Philip Morris USA Inc.* (2013) 217 Cal.App.4th 992, 1001; *Perez v. Torres* (2012) 206 Cal.App.4th 418, 424 (*Perez*); *Puerta v. Torres* (2011) 195 Cal.App.4th 1267, 1273 (*Puerta*).)  Engler's offer did not include an acceptance provision.  It therefore did not comply with the statute, and the court did not err by granting Chao's motion to tax costs claimed under the statute.

111

Bigler-Engler attempts to distinguish these cases by claiming that Chao affirmatively rejected Engler's settlement offer (and discouraged any further offers) rather than simply ignoring it. But the statute imposes a mandatory requirement: "The written offer *shall include* . . . a provision that allows the accepting party to indicate acceptance of the offer . . . ." (Code Civ. Proc., § 998, subd. (b).) "[W]e interpret the mandatory requirements of the statute without regards to what occurred in this particular case or the tactics of a party." (*Boeken, supra*, 217 Cal.App.4th at p. 1004.) Engler's failure to include an acceptance provision renders her offer invalid under the statute. (*Ibid.*; see *Perez, supra*, 206 Cal.App.4th at p. 424 ["The plain language of the statute requires *all* offers to contain an acceptance provision."]; *Puerta, supra*, 195 Cal.App.4th at p. 1273 ["The offer at issue here contained nothing regarding acceptance, only the terms of the offer itself and its expiration date. It was therefore invalid under the plain language of the statute, regardless of whether [the opposing party] ever intended to accept the offer or not."].) It is irrelevant whether Chao ignored the offer or, as here, rejected it.

Bigler-Engler also claims Chao is equitably estopped from arguing that Engler's offer was invalid. Even assuming that Chao has not forfeited this argument by failing to raise it in the trial court, we disagree that equitable estoppel applies here. "The doctrine of equitable estoppel is founded on concepts of equity and fair dealing. It provides that a person may not deny the existence of a state of facts if he intentionally led another to believe a particular circumstance to be true and to rely upon such belief to his detriment. The elements of the doctrine are that (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party

112

asserting the estoppel has a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury." (*Strong v. County of Santa Cruz* (1975) 15 Cal.3d 720, 725.)  In order to establish equitable estoppel under the circumstances here, therefore, Bigler-Engler must show that (1) Chao knew Engler's offer was invalid; (2) Chao intended that his rejection would be viewed as a statement that the offer was not invalid; (3) Engler did not know the offer was invalid; and (4) Engler relied on Chao's rejection to her injury.  Bigler-Engler has not established these elements.  For example, Bigler-Engler has not shown that Chao knew the offer was invalid or that Chao intended that his rejection would be seen as a statement that the offer was not invalid.

*Battuello v. Battuello* (1998) 64 Cal.App.4th 842, on which Bigler-Engler relies, is distinguishable.  In that case, the plaintiff alleged "that during the settlement negotiations which followed his father's death, [defendant] convinced him not to file a timely suit by telling him that he would receive the vineyard [that was the subject of the dispute].  By the time [plaintiff] learned that [defendant's] promise was false, the statute of limitations had passed." (*Id.* at p. 848.)  The court concluded that plaintiff's allegations were sufficient to support a claim of equitable estoppel.  (*Ibid.*)  Here, by contrast, Chao did not make any false statement or promises, nor is there evidence he intended to deceive Engler into believing her settlement offer was not invalid.  Chao simply rejected it, describing the offer as Engler had described it.  Under the facts of this case, equitable estoppel does not apply.

113

## DISPOSITION

The judgment is reversed in part as to Engler's causes of action for strict liability design defect against Oasis, strict liability failure to warn against Oasis, intentional concealment against Breg, and intentional misrepresentation against Chao. The superior court is directed to enter judgment in favor of the relevant defendant on those claims. The judgment as to Engler's noneconomic compensatory damages as to all three defendants and punitive damages against Chao and Breg is also reversed. The superior court shall conduct a new trial on noneconomic compensatory damages as to all three defendants and punitive damages as to Chao only, unless Bigler-Engler consents to a reduction of the jury's noneconomic compensatory damages award to $1,300,000 and the jury's punitive damages award against Chao to $150,000. Bigler-Engler's consent must be in writing and filed with the clerk of the superior court and served on all parties within 30 days of the date this court's remittitur issues. If Bigler-Engler consents to both reductions, the superior court shall conduct any further proceedings that are necessary and appropriate and enter judgment consistent with this opinion. If Bigler-Engler consents to a reduction in noneconomic compensatory damages only, the superior court shall accept that consent, conduct a new trial on the issue of punitive damages against Chao, and conduct further proceedings consistent with this opinion. In all other respects, the judgment is affirmed. The parties shall bear their own costs on appeal.

114

HALLER, J.

WE CONCUR:


BENKE, Acting P. J.


IRION, J.